DAVID M. COOLEY *vs.* ALFRED W. BETTIGOLE & another,[1] trustees
(and a companion case[2]).

Hampden.    September 10, 1973. — October 19, 1973.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Landlord and Tenant,* Parking facilities, Construction of lease, Repairs, Eviction.

Where leases of office space occupied by medical tenants provided that the lessor would provide "without additional charge to the tenant[s] reasonable parking facilities for the tenant[s] and . . . [their] invitees," but also provided that the lessor should "have the exclusive right to regulate and control the parking area" and that the tenants agreed "to conform to such rules and regulations as . . . [might] be established," and it appeared that open access to the parking area had resulted in preëmption of space by unauthorized users and other difficulties, the lessor was authorized unilaterally to impose a reasonable scheme of charging invitee patients of the tenants a small sum, refundable to the patients, for access to and use of the lot, and to require reasonable assistance from the tenants or their employees in implementing the arrangement. [516-524]

Where a lessor of commercial office space declined to repair a hole in a lessee's window caused by a thrown stone and the lessee thereafter suspended at the window an offensive large soft-drink carton designed to irritate the lessor and to call attention to the window, despite lease provisions barring signs without the lessor's consent and barring use of the leased premises "for any purpose reasonably objectionable" to the lessor, the lessor was entitled to declare a forfeiture of the lease and to evict the lessee. [524-526]

---

[1] Benjamin Myers (or Meyers), co-trustee with the defendant Bettigole of the three separate real estate trusts which own the contiguous properties in question. As the defendant Bettigole has been the only trustee active in the management of the properties and is now the sole beneficial owner of each trust, he will be referred to in the body of this opinion as if he were the sole defendant and owner.

[2] The present plaintiffs in the companion case are Samuel Hellerman, Louis A. Izenstein, Gerard I. Lichter, Joseph Pendola, Albert C. Rock, Jr., Maurice R. Ruben, Walter Tauber and Harry Tapp. The defendants are the same as those in the captioned case.

In a lease of premises for other than dwelling purposes there is no implied
  agreement on the part of the landlord to make repairs. [526, fn. 13]

TWO BILLS IN EQUITY filed in the Superior Court on
September 21, 1970, and March 26, 1971, respectively.

The suits were heard by *Moriarty, J.*

*William K. Danaher, Jr.,* for the defendants.

*Frederick S. Pillsbury* for the plaintiffs.

GRANT, J.   The plaintiffs are either physicians or den-
tists who occupy offices in two of the three office buildings
owned and operated by the defendant at Nos. 110, 120 and
130 Maple Street in Springfield. Both bills seek declaratory
and other relief with respect to the defendant's right (if
any) to charge patients visiting the plaintiffs' offices for the
use of automobile parking facilities which lie to the rear of
all three buildings. The separate bill brought by the
plaintiff Cooley, which was first in point of time, also seeks
an injunction against the defendant's evicting that plain-
tiff from an office in the building at 130 Maple Street. The
two cases were consolidated for trial in the Superior Court,
where the trial judge filed voluntary findings of fact which
he later adopted as a statutory report. The defendant has
appealed from final decrees which enjoined him from
evicting Cooley and which, in effect, required him to
provide parking to the plaintiffs' patients without any
charge to them. The evidence is reported.

### THE PARKING CONTROVERSY.

The three modern, multi-story office buildings in ques-
tion were constructed by the defendant and a former
partner during the period from 1954 through 1963. Automo-
bile parking facilities have been constructed behind each
building which run through to Dale Street in the rear. Since
the completion of the facilities lying to the rear of No. 110
Maple Street the entire area devoted to parking has been
operated as a single lot available for use in common by the
tenants of all three buildings and by their employees and
invitees. Access to and egress from the lot are provided by

two driveways leading from Maple Street and one driveway leading from Dale Street. The lot contains approximately 650 parking spaces.

Each medical tenant[3] has received a printed form of lease drafted by the defendant which, in the parts here material, includes the following provisions: "TWO: The [landlord] shall, without additional charge to the [tenant], in the manner customary in office buildings, furnish heat, electricity, elevator service, hot and cold water, air conditioning, window cleaning, emptying of waste baskets and ash-trays, and reasonable parking facilities for the [tenant] and his invitees without liability, however, for the cessation of any of said services when caused by circumstances beyond the control of the [landlord]"; "TWELVE: If, for any reason, the parking facilities should be reduced by more than 10%, the [tenant] shall have the option to terminate this lease forthwith." Each tenant covenanted to comply with a number of "building rules" made parts of the lease, which included the following: "8. The [landlord] shall have the exclusive right to regulate and control the parking area and the [tenant] agrees to conform to such rules and regulations as may be established."[4]

From the time of the completion of the first parking facilities lying to the rear of No. 130 Maple Street until the spring of 1970 patients of the plaintiffs were permitted (with exceptions not here material) to use such parking facilities as were available without any charge to them and without any restriction on their access to or egress from the lot as from time to time constituted. By that time a problem had developed as a result of the use of the parking facilities by unauthorized persons. People living in the neighborhood or visiting nearby business or commercial establishments, students at nearby schools, and shoppers

---

[3] The parking arrangements made for other than medical tenants are not material.

[4] The quoted provisions have been taken from the current Cooley lease, which is for a term commencing on September 1, 1965, and ending on December 31, 1975. We do not know when the leases to the majority of the other plaintiffs were executed or renewed or when they expire.

in the downtown Springfield business district had begun to park their automobiles in the lot in increasing numbers. Such unauthorized use of the lot occurred at all hours of the day, and some persons used the lot for overnight parking. The unauthorized use resulted in a shortage of parking spaces during peak business hours, increased the amount of trash deposited in the lot and caused considerable difficulty in keeping the lot clean and further difficulty with snow removal during the winter months.

At some unspecified point in time in the spring of 1970 the defendant installed gates at the entrances to and exits from the parking lot. He thereupon proposed unilaterally to implement a scheme designed to control or eliminate the use of the lot by unauthorized persons. Under the proposed scheme, which thereafter came to be known as the chit system, invitee patients of the plaintiffs and other medical tenants were to be required to deposit a twenty-five cent coin in a mechanical device in order to gain vehicular access to the lot. That sum was to be refundable to the patient upon his presentation at one of four (later reduced to three) business establishments located in various of the buildings of a chit which would be supplied by the defendant and which would require on its face the stamped validation of one of the approximately forty medical tenants, the date, the name of the patient and the patient's motor vehicle registration number. Upon learning of the defendant's intentions many of the medical tenants, led by the plaintiff Cooley, took the position that the imposition of any such scheme would be contrary to the defendant's obligations under art. 2 of the lease and banded together to oppose, by written petition and otherwise, the defendant's then pending application to the city council of Springfield for a license to operate the lot under the provisions of G. L. c. 148, § 56 (as most recently amended by St. 1965, c. 444).

Following negotiations with Cooley and various of the medical tenants the defendant, on May 18, 1970, executed what the parties have referred to as an amendment[5] to the

5 The so-called amendment, drafted primarily by Cooley (who is also a member

lease of all medical tenants, including the plaintiffs. The plaintiffs and other medical tenants then withdrew their opposition to the defendant's application for a license for the parking lot, which was thereupon granted by the city council. The essence of the scheme called for by the amendment was that the patients of all medical tenants should be permitted to enter the parking lot without payment of any initial charge and to leave the lot, also without charge, upon presentation to one of several attendants employed by the defendant of validated chits similar to the one already described. The plaintiffs and other medical tenants objected almost immediately to the manner in which the defendant sought to implement the bare provisions of the May 18 amendment, and they succeeded in persuading the city council to revoke the defendant's license on June 1, 1970.[6]

During the period from approximately June 1, 1970, until September 13, 1971,[7] the defendant appears to have enforced the refundable chit system originally proposed by him prior to the lease amendment of May 18, 1970. During the period from September 14, 1971, and at least until the time these cases were heard in the Superior Court in December of 1971, only patients visiting the plaintiffs were permitted to redeem chits.[8] With the implementation of the chit system the defendant's attendants were no longer required to be positioned at the gates and were free to patrol the lot in such fashion as to keep out the great majority of

of the bar), was not signed by the plaintiffs or by any of the other medical tenants but took the form of a covenant by the defendant and contained a sketchy outline of the manner in which the defendant would thereafter operate the lot so far as patients of the medical tenants should be concerned. The amendment concluded with the following: "V. The foregoing provisions shall be applicable and effective only during such time as the landlord shall have a license from the City of Springfield to conduct an open air parking lot. . . ."

[6] The history of the defendant's subsequent litigation with the city council concerning a permit is disclosed in part in the opinion of this court in *Bettigole* v. *City Council of Springfield, post,* 816 (1973).

[7] The significance of this particular date is explained in the *Bettigole* case (fn. 6).

[8] Means were at all times provided by which all medical tenants and their employees could enter and leave the lot without charge or inconvenience to them.

the unauthorized parkers who were willing to pay twenty-five cents to secure physical admission to the lot. There was evidence that as a result of the chit system patients of the medical tenants have seldom, if ever, experienced any real difficulty in finding parking spaces available during normal business hours.[9]

The findings, rulings and decrees of the Superior Court were made and entered at times when the defendant did in fact hold a license for the operation of the parking lot under the provisions of G. L. c. 148, § 56, and the decrees understandably reflect the trial judge's views of the rights of the parties under the May 18, 1970, amendment of the leases of all medical tenants. We now know, both from the *Bettigole* case (see fn. 6) and from statements made by counsel at the oral argument of this case, that the defendant has had no such license since April 30, 1972, and that he has no present intention of seeking a similar license for any future period. As the amendment was, by its express terms (fn. 5), to apply only during such period as the defendant should have such a license, it follows that the decrees of the Superior Court do not and cannot terminate the parking controversy. In these circumstances we accede to the requests of counsel that we express our views on the rights of the parties under the original leases, unaffected by the amendment. See *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731 (1943); *McLaughlin* v. *Board of Appeals of Harwich,* 359 Mass. 416, 419 (1971); *Harvard* v. *Maxant,* 360 Mass. 432, 437 (1971). We are assisted in this process by certain subsidiary findings made by the trial judge.

We agree with the trial judge that the leases are ambiguous in the sense that they are silent on the question whether the defendant can charge the invitees of the medical tenants (as opposed to the tenants themselves) for parking and, therefore, that parol evidence was admissible

---

[9] All leases or renewals thereof which the defendant has given to any of the medical tenants since the onset of the present controversy have been express to the point that the defendant reserves the right to charge invitee-patients for parking.

to show the circumstances in which the leases were originally negotiated (*Stoops* v. *Smith,* 100 Mass. 63, 65-67 [1868]; *National Paper & Cordage Co. Inc.* v. *Atlantic Carton Corp.* 332 Mass. 651, 653-654 [1955]; *Imper Realty Corp.* v. *Riss,* 358 Mass. 529, 534-535 [1970]; *Robert Industries, Inc.* v. *Spence,* 362 Mass. 751, 753-754 [1973]) and to show the practical construction placed on the leases by the parties themselves (*New York Cent. R.R.* v. *Stoneman,* 233 Mass. 258, 262-263 [1919]; *S. C.* 236 Mass. 81 [1920]; *Pittsfield & No. Adams R.R.* v. *Boston & Albany R.R.* 260 Mass. 390, 397-398 [1927]).[10] We also agree that the leases should be construed more strongly against the defendant who drew them (*Charles E. Burt, Inc.* v. *Seven Grand Corp.* 340 Mass. 124, 127-128 [1959], and cases cited).

The evidence as to what may have been customary with respect to providing free parking for invitees in other office buildings (particularly office buildings occupied by medical tenants) at the time of the original execution or at the time of the renewal of any of the present leases is indecisive (see fn. 4). We do know from the evidence and from the findings of the trial judge that the defendant represented to some of the original medical tenants of the building at No. 130 Maple Street that no charge would be made to their invitees for parking. The practical construction placed on the leases by the parties, at least until the present controversy arose, was that no such charge was ever made to invitees. We note that even the so-called chit system was made refundable (on the defendant's terms) as to the invitees of all medical tenants until September 14, 1971, a date approximately eighteen months after the battle lines were drawn in this case. We also note that an unqualified right on the defendant's part to charge patients for parking could seriously detract from the value of the plaintiffs' several leaseholds, and particularly from the value of the covenant in each lease that the defendant would "without additional charge to the [tenant] . . . furnish . . . reasonable

---

[10] We reach our conclusions unaffected by the evidence of what some of the plaintiffs thought the leases do or should mean.

parking facilities for the [tenant] and his invitees . . ." (art. 2). The importance of such facilities to all parties was recognized by the fact that the defendant was careful to negative any obligation to provide parking facilities "when caused by circumstances beyond . . . [his] control" (art. 2) and by the fact that the medical tenants were given the option to terminate their leases if "the parking facilities should be reduced by more than 10%" (art. 12).

We cannot, however, ignore the provisions of building rule No. 8 (incorporated in each lease) that the defendant "shall have the exclusive right to regulate and control the parking area and the [tenant] agrees to conform to such rules and regulations as may be established." Reading the leases as a whole, it is our opinion that the provision just quoted authorizes the defendant, without violating art. 2 of the lease, and when confronted by the unauthorized parking and the consequences thereof which have already been described, unilaterally to implement and enforce a reasonable scheme for the use of the parking lot by patients of medical tenants. Such a scheme may provide for free access by the patients and for free egress by them upon presentation to the defendant's attendants of validated chits of the type already described; it may in the alternative provide for the initial collection of a reasonable sum (such as twenty-five cents) from each patient as a condition of entrance if that sum is readily and conveniently refundable to the patient upon presentation of such a chit. We are further of opinion that the defendant's "exclusive right to regulate and control the parking area" and the medical tenants' concomitant agreements "to conform to such rules and regulations as may be established" are to be construed to permit the defendant, in the circumstances here disclosed, to require such tenants (or their employees) to expend reasonable amounts of time in preparing validation chits without resulting in an "additional charge" to those tenants within the meaning of art. 2 of the several leases.

We see nothing unreasonable in the amount of the charge which the defendant has employed thus far, or in the amount of time which has already been expended by the

medical tenants (or their employees) in the preparation of validating chits. The reasonableness of other features of any such scheme is better left for determination by the trial judge, who not only heard and saw the witnesses but also took a view of the buildings and the parking lot (nowhere accurately described in the evidence) and presumably knows the locations of the places where chits were redeemable in the past (or might be made redeemable in the future). He is in a better position than we to determine (on further evidence if necessary) the reasonable hours of each day during and the places at which the defendant should be required to provide attendants to take up chits from departing patients or during which he should be permitted to make charges to patients and required to make refunds. See *New York Cent. R.R.* v. *Stoneman,* 233 Mass. 258, 262-263 (1919); *S. C.* 236 Mass. 81, 84 (1920). Similarly, the trial judge is better equipped than we to pass on the question of what, if anything, may reasonably be required to appear on validating chits in order to identify patients as persons legitimately entitled to free egress from the lot or to refunds of permitted charges.

The final decree in the case now prosecuted by Samuel Hellerman and others (fn. 2) is vacated, and that case is remanded to the Superior Court for further proceedings and for further declaratory relief not inconsistent with the guidelines indicated in this opinion. As there was no evidence that any plaintiff has lost a patient (or that the frequency of any patient's visits has decreased) or that any plaintiff has suffered any other form of actual damage as the result of anything done by the defendant to date, any award of damages for anything which the defendant has already done (exclusive of acts required or permitted by the so-called "supplemental decree" entered on March 16, 1972) which the court may find unreasonable under the indicated guidelines is to be confined to nominal damages. See *Corbett* v. *Derman Shoe Co.* 338 Mass. 405, 412 (1959); *Holt* v. *County Bdcst. Corp.* 343 Mass. 363, 366 (1961), and cases cited. The defendant, within thirty days of the rescript from this court, is to submit to the trial judge a

proposed scheme for the future operation of the parking lot with respect to the patients of such of the plaintiffs in this case as are still tenants of the defendant under the form of lease discussed in this opinion during the unexpired portions of the leases still held by such plaintiffs (see fns. 2, 4 and 9). The trial judge is to pass on the reasonableness of any scheme so proposed. The new final declaratory decree is to state the specific date until which such scheme shall apply to the patients of each such remaining plaintiff.

### THE FORFEITURE OF THE COOLEY LEASE.

At some time during the first week of June, 1970, an unknown person threw a small stone through a window in the plaintiff Cooley's second floor office at No. 130 Maple Street. Following several unsuccessful demands on the defendant that he repair the window in accordance with what Cooley regarded as the defendant's obligation under the lease already referred to, Cooley covered the hole (and possibly a larger area of the window) with a portion of a cardboard carton which bore the colorful advertising of a well known brand of carbonated soft drink. The defendant did not repair the window. By letter dated June 30, 1970, the defendant advised Cooley that in his opinion the maintenance of the cardboard was in violation of Nos. 2 and 3 of the aforementioned building rules incorporated in the lease[11] and warned Cooley that if the cardboard were not removed immediately, he (Cooley) would be deemed in violation of the lease and appropriate legal action would be taken forthwith. The cardboard then in question was promptly removed but was replaced at a somewhat later date by another cardboard which precipitated the defendant's efforts to evict Cooley.

---

[11] "2. The [tenant] shall not place any numbers, signs, advertisements or notices in or upon any part of the building of which the leased premises are a part without the consent of the [landlord]. Window treatment shall be subject to the approval of the [landlord].

3. The [tenant] shall not use any part of the building for any purpose which may disturb other [tenants], for any purpose which is unduly hazardous on account of fire, or for any unlawful purpose, or for any purpose reasonably objectionable to the [landlord]."

By August 17, 1970, Cooley was displaying in and from the window in question the whole or the major portion of another cardboard carton which, before it had been flattened out, had been designed to hold twenty-four twelve-ounce cans of another well known brand of carbonated soft drink. The carton was so positioned that its top and two sides, bearing prominent red lettering (on a white background) which advertised the carton's original contents, protruded beyond and were suspended outside the window frame, well below the hole in the window, and in plain view from Maple Street. In no sense was the portion of the carton just described necessary to cover the hole in the window. The trial judge specifically found that the cardboard was offensive and intended to be so and that its purposes were to irritate the defendant and call attention to the window. Other tenants complained of the cardboard to the defendant.

By written notice of August 18, 1970, the defendant, acting under a reserved right to reënter for a breach of any of the covenants of the lease, declared a forfeiture of Cooley's lease for his violation of Nos. 2 and 3 of the building rules (fn. 11) and gave him notice to quit the leased premises. Entry under such notice was made on September 4, 1970. Cooley responded on September 21, 1970, by filing the original of the earlier of the two bills in equity now before us. That bill sought relief from the forfeiture as well as declaratory relief with respect to the parking controversy.

The trial judge found that Cooley's acts were performed in an atmosphere of ill feeling generated by the defendant's attempts to avoid what the trial judge ruled were the defendant's obligations with respect to the parking lot[12] and repair of the broken window. The judge, apparently because of his conclusion that the defendant was obligated

---

[12] The trial judge made no finding, nor do we, that the defendant's action in declaring a forfeiture of the lease was in any way prompted by Cooley's active participation in the parking controversy.

to repair the window, enjoined the defendant from evicting Cooley. We do not concur in that conclusion.[13]

In our opinion Cooley's bill must be dismissed on the authority of the case of *Finkovitch* v. *Cline,* 236 Mass. 196 (1920). In that case it was held that the tenant's continued display of drying laundry on a second floor piazza of an apartment building in a tasteful residential neighborhood of predominantly single homes was a violation of the tenant's covenant not to "make or suffer any . . . offensive use" of the premises and that the tenant should not be relieved from a forfeiture of his lease because of his intentional and continuous violation of the covenant over the objection of the landlord. In the present case Cooley, without justification, and after receipt of fair warning, committed an intentional violation of his covenant "not [to] use any part of the building . . . for any purpose reasonably objectionable to" the defendant (see fn. 11). We cannot say on this record that the defendant did not or could not find "reasonably objectionable" the cardboard which was being displayed at the time of forfeiture.

The final decree in the Cooley case is reversed, and a new final decree is to be entered dismissing the bill.

### CONCLUSION.

Both cases are remanded to the Superior Court for the further proceedings required by this opinion. Costs of appeal are not to be taxed in favor of any party.

*So ordered.*

---

[13] The defendant was under no obligation to repair the window. He had not expressly covenanted to do so, and in a lease of premises for other than dwelling purposes there is no implied agreement on the part of the landlord to make repairs. See the cases cited in *Boston Housing Authy.* v. *Hemingway,* 363 Mass. 184, 187-188, 206-207, 213 (1973). Standing by itself, the defendant's reserved right to enter the premises to make repairs did not obligate him to make any repairs.'*Stone* v. *Sullivan,* 300 Mass. 450, 454-455 (1938), and cases cited. *Ryan* v. *Boston Housing Authy.* 322 Mass. 299, 301 (1948). As to whether the broken window was a "casualty" within art. 7 of the lease, see *Leominster Fuel Co.* v. *Scanlon,* 243 Mass. 126, 128-129 (1922); as to the defendant's repair of other windows, see *McKeon* v. *Cutter,* 156 Mass. 296, 298 (1892); *McLean* v. *Fiske Wharf & Warehouse Co.* 158 Mass. 472, 474 (1893). If Cooley believed that the defendant was legally obligated to repair the window, his remedy was by an action for damages. See *Boston Housing Authy.* v. *Hemingway,* 363 Mass. 184, 188 (1973).