van Gestel, J.
This matter is before the Court on cross motions for summary judgment. The plaintiff, Information Mapping, Inc. (“IMI”), has filed its Motion *545 for Partial Summary Judgment (Paper #10), seeking liability only on Count I and a declaratoiy judgment on Count III. The defendants, Duffy Properties, LLC (“Duffy Properties”) and Westshell, LLC (“Westshell”), have filed their Motion for Summary Judgment as to All Counts of the Complaint (Paper #16).
BACKGROUND
Westshell owns a commercial building located on Waverley Oaks Road in Waltham, Massachusetts (the “Premises”).[2] On May 1, 2001, Westshell leased (the “Lease”) the entire Premises to a company called InfoLibria, Inc. (“InfoLibria”) for a term of five years.
IMI licenses and sells a copyrighted method of presenting information, and instructs and trains people to use that method.
On December 3, 2001, InfoLibria subleased a portion of the fourth floor of the Premises (the “Sublease”) to IMI. Westshell reviewed the terms of IMI’s Sublease and approved the same.
The Sublease provides, among other things, that “(t]he terms and provisions of the Lease are incorporated herein by reference . . . with the same force and effect as if they were fully set forth herein.” Further, pursuant to Section 7.4, the Sublease terminates simultaneously with the termination of the Lease.
InfoLibria experienced financial difficulties. Consequently, in the fall of 2002, InfoLibria presented Westshell with a written statement of its financial condition. On October 24, 2002, Westshell responded to InfoLibria as follows:
The ... accounting, provided to us by your consultant . . . expresses a clear plan to deplete the cash remaining in the company without any “line item” accounting for InfoLibria’s lease payments. Westshell considers this statement a clear acknowledgment of InfoLibria’s inability to pay its rent in the future.
The Lease includes a provision that InfoLibria will be in default if it “. . . admits in writing its inability to pay debts generally as they became due...” The Lease further gives Westshell the right to “terminate this Lease by written notice effective on the date of the notice or any date specified in the notice . . .”
On November 14, 2002, InfoLibria held an auction of its assets, which it advertised as a “Complete Liquidation of a Network Infrastructure Solution Firm.”
On November 15, 2002, Westshell sent a notice of termination of the Lease to InfoLibria, immediately terminating the Lease based upon InfoLibria’s liquidation of its assets and its written statement of insolvency. The notice was signed by Robert L. Duffy, Jr. Mr. Duffy, in his capacity as Trustee of the RLD Trust, is a member of Westshell. He also is an attorney. Additionally, Robert Duffy, Jr., again in his capacity as Trustee of the RLD Trust, is both the manager of Duffy Properties and one of its four members.
InfoLibria contested the termination of the Lease and negotiated with Westshell concerning the matter. As a result, on November 21, 2002, Westshell provided to InfoLibria a document purporting to revoke the Lease termination. Ultimately, on November 29, 2002, InfoLibria assigned to Duffy Properties its interests in the Lease and the Sublease. IMI was notified of this fact on December 2, 2002.
Article XII of the Sublease, titled “Escrow for Insolvency of Sublandlord,” provides, in pertinent part:
In order to (a) reimburse Subtenant for its reasonable relocation expenses and/or (b) cover an increase in Subtenant’s rent under a replacement lease of the Sublease Premises resulting from the termination of this Sublease pursuant to a Default by Sublandlord under Section 9.1(a) or Section 9.1 (b) of the Lease, Sublandlord shall deposit into an escrow account to be maintained by Hunneman Commercial Company (the “Termination Escrow”), (i) the sum of $12,000 on the Rent Commencement Date, and (ii) the sum of $2,625 (each, a “Monthly Escrow Deposit”), monthly on the first day of each month hereafter and continuing until March 2004, or until the balance of the Termination Escrow is $75,000, it being agreed that total deposits made hereunder by Sublandlord shall not exceed $75,000.
InfoLibria failed to make any of these escrow payments, and Duffy Properties has not done so either since the purported assignment of the Lease to it on November 29, 2002.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Lindsay v. Romano, 427 Mass. 771, 773 (1998): Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 283 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
IMI’s Motion for Partial Summary Judgment
IMI’s complaint is in three counts: for breach of the implied covenant of good faith and fair dealing; for breach of the covenant of quiet enjoyment; and, for a declaratory judgment that its Sublease terminated.
This case is unusual in the sense that it is the tenant that is advocating the termination of its leasehold rights because of something not of its own doing. The case turns principally on whether the Lease between Westshell, as landlord, and InfoLibria, as tenant, was terminated on November 15, 2002, when Westshell issued its notice of termination.
*546 There is no question about Westshell’s right to terminate the Lease on a default by InfoLibria. However, in order for the termination to be effective, InfoLibria had to be in default. Further, Westshell did not have to exercise that right even in the face of a default.
Massachusetts law, which must be considered part of both the Lease and the Sublease, “does not favor a forfeiture” of a lease. Howard D. Johnson Co. v. Madigan, 361 Mass. 454, 456-59 (1972); Eno Systems, Inc. v. Eno, 311 Mass. 334, 338 (1942); Lundin v. Schoeffel, 167 Mass. 465, 469-70 (1897). Indeed, the law quite strongly disfavors forfeitures in the landlord/tenant context. See, e.g., Edward’s Fine Furniture, Inc. v. Ditullio, 356 Mass. 380, 381 (1960); Mulcahy & Dean, Inc. v. Hanley, 332 Mass. 232, 234 (1955); Paeff v. Hawkins-Washington Realty Co., 320 Mass. 144, 147-48 (1946); Judkins v. Charette, 255 Mass. 76, 83 (1926).
When a prime lease is terminated ... a sublease subordinate to the prime ordinarily terminates (or fails): that is part of the common understanding of “subordinate” . . . More generally, where a prime ends in accordance with its terms, express or implied, the sublease has to submit to the same fate: this is expectable and the subtenant cannot fairly complain.
Suppose, however, that the fee owner and the prime lessee agree, outside the terms of the prime lease, to end or cancel it. Here we begin to be troubled about the fairness of holding that the sublease is thereby defeated ... In the situations supposed, when the termination of the prime lease occurs by act of the parties outside the terms of that lease, we can say (with some awkwardness) that the surrender foisted on the sublessee would be coming about by “voluntary” acts of the fee owner and prime lessee — whereas in case of ordinary forfeiture the surrender is by operation of the lease and the law and so is “involuntary.”
What we have labored to describe is put shortly by Chief Justice Wheeler in Golde Clothes Shop, Inc. v. Silver, 95 Conn. 678, 685-86 (1921):
A voluntary surrender by a principal lessee to a principal lessor, effected in a manner contrary to the provision of termination in the lease, does not affect the rights of a tenant acquired under a sublease which the lessor had authority to make.
Applebee’s Northeast, Inc. v. Methuen Investors, Inc., 46 Mass.App.Ct. 777, 781 (1999). It is with this legal backdrop that the Court considers the situation on November 15, 2002, and thereafter.
Clearly, InfoLibria sent to Westshell written information that indicated that its financial situation was precarious. And just as clearly, Westshell responded as if InfoLibria had made the requisite admission “in writing of its inability to pay debts generally as they became due.” But there is included in the motion papers affidavit evidence from InfoLibria to the effect that it did not intend, by its report on its finances, to do other than warn of future impending events and start the ball rolling toward a negotiated resolution of its Lease obligations.
A lease should be construed more strongly against a landlord, like Westshell here, who drew it. Cooley v. Bettigole, 1 Mass.App.Ct. 515, 521 (1973). For that reason alone, this Court is wary of construing InfoLibria’s October 24, 2002, letter and enclosure as the triggering event for Westshell’s purported termination. Further, Westshell did not respond immediately. Instead, it sent its “termination” letter after InfoLibria’s auction of most of its assets on November 14, 2002.
The auction itself might be seen as an indication of InfoLibria’s inability to pay debts; however, it is hardly conclusive on that point. Nor, of course, is the auction a “written statement” of InfoLibria’s financial condition. InfoLibria, for all one knows, may have raised enough money at the auction to keep on paying its rent, at least for sufficient time to attempt to negotiate a better buy-out of the Lease. Indeed, the record here shows that InfoLibria did continue to pay its rent, and InfoLibria and Westshell did negotiate an arrangement to voluntarily terminate InfoLibria’s obligations under the Lease.
This Court cannot conclude on the present record that the Lease terminated on November 15, 2002, or that the Sublease terminated either then or later as a result of the voluntary termination between InfoLibria and Westshell.
As a fallback position, IMI argues that the assignment to Duffy Properties — characterized by IMI as Westshell’s alter ego — resulted in a merger that eliminated the Lease and the Sublease along with it. See, e.g., 33A Mass. Prac. Series, Landlord and Tenant Law, Sec. 15:29 (3d ed.). IMI argues that where a lessee conveys his lease to the lessor who is the owner of the fee, the lease is effectively surrendered and merges into the fee. Id. at Sec. 15:7.
This argument represents creative lawyering, but it cannot carry the day. It depends upon a kind of veil-piercing that is unsupported by the record. Westshell, LLC and Duffy Properties, LLC, although each owned and controlled by the same members of the Duffy family, are not shown to be other than separate legal entities, existing for separate purposes.
Although common ownership of stock of two or more corporations together with common management, standing alone, will not give rise to liabiliiy on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of *547 pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercoiporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of “closely identified” corporations, a court “need not consider with nicety which of them” ought to be held liable for the act of one corporation “for which the plaintiff deserves payment.” See W.W. Britton, Inc. v. S.M. Hill Co., 327 Mass. 335, 338-39 [1951].
My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619 (1968).
Nothing in the record here demonstrates “some fraudulent or injurious consequence of the intercorporate relationship” between Westshell and Duffy Properties with regard to the Lease or the Sublease in issue. Nor is there any “confused intermingling of activity of [Westshell and Duffy Properties] engaged in a common enterprise with substantial disregard of the separate nature of [those two] entities, or serious ambiguity about the manner and capacity in which [those two entities] and their respective representatives are acting.”
This is not one of those situations “where there is common control of a group of separate corporations engaged in a single enterprise, [with a] failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses (see Acton Plumbing & Heating Co. v. Jared Builders, Inc., 368 Mich. 626, 628-30, 118 N.W.2d 956), records, and finances, [that] may warrant some disregard of the separate entities in [a] rare particular situation] ] in order to prevent gross inequity.” Id. at 620. In short, this is not one of those “rare particular situations [in which there needs to be a disregard of the separate entities] in order to prevent gross inequity.”
As a third argument that the Sublease has terminated, IMI suggests that Duffy Properties’ obligations as the new Sublandlord are “illusory.” This, IMI contends, is because since the Duffy family controls both Westshell and Duffy Properties, the family can simply cause Westshell and Duffy Properties to reach an agreement to terminate the Lease and thereby terminate IMI’s Sublease.
Again, another creative argument fails. The situation posed by IMI would result in a voluntary termination of the Lease. This, however, is the situation contemplated in Applebee’s, supra 47 Mass.App.Ct. at 781. It would result in a voluntary surrender by a principal lessee to a principal lessor, effected in a manner contrary to the provision of termination in the lease, which does not affect the rights of a tenant acquired under a sublease which the lessor had authority to make.
Finally, IMI cites to Wesson v. Leone Enterprises, Inc., 437 Mass. 708 (2002), and argues that there has been a breach of a key provision of the Sublease that permitted IMI to terminate it. Wesson updated the law of Massachusetts with regard to the “dependant covenants” rule affecting lease agreements. The key aspects of its holdings, for purposes of this case, appear at pp. 720-22 of the opinion and read as follows:
We conclude that the better rule is the rule of mutually dependent covenants set forth in the Restatement (Second) of Property (Landlord and Tenant) Sec. 7.1 (1977), the principles of which we adopt to the extent necessary to resolve the issues in this case. Specifically, we adopt so much of the Restatement that provides as follows:
Except to the extent the parties to a lease validly agree otherwise, if the landlord fails to perform a valid promise contained in the lease to do, or to refrain from doing, something . . . and as a consequence thereof, the tenant is deprived of a significant inducement to the making of the lease, and if the landlord does not perform his promise within a reasonable period of time after being requested to do so, the tenant may (1) terminate the lease . . .
[Restatement (Second) of Property (Landlord and Tenant) Sec. 7.1 (1977)] at 247.
The rule of this section ... is based on a logical extension of the position taken by a significant number of judicial decisions which have applied the [dependence of obligations] doctrine in connection with the failure of the landlord to fulfill his obligations in regard to the condition of the leased property.
Restatement (Second) of Property (Landlord and Tenant), supra at Sec. 7.1 Reporters Note at 252. It also reflects our view of the better reasoned path to follow in modernizing the law of commercial leases.
The requirements of the rule we have adopted today are different from the requirements necessary to demonstrate a constructive eviction. For example, the rule does not require that the premises be “untenantable for the purposes for which they were used,” in order for the tenant to terminate the lease and vacate the premises. It is sufficient for the tenant to demonstrate the landlord’s failure, after notice, to perform a promise that was a significant inducement to the tenant’s entering the lease in the first instance. We interpret this language to include promises that constitute a substantial benefit understood at the time the lease was entered to be *548 significant to the purpose thereof. Richard Barton Enters., Inc. v. Tsern, 928 P.2d 368, 378 (Utah 1996) (covenant to pay rent dependent on lessor’s performance of covenants that were significant inducement to enter lease or significant to “the purpose for which the lessee entered into the lease . . .”) [I]t might include promises having little to do with the condition of the premises, such as an agreement not to lease space in the same building to competing businesses. See Teodori v. Werner, 490 Pa. 58, 65, 415 A.2d 31 (1980) (landlord’s non-competition promise critical to commercial lease agreement).
The “key promise” here is the Escrow Provisions contained in Article XII, quoted above in the Background section. There is no question but that this provision was an important inducement for IMI to enter into the Sublease with InfoLibria.[3] There also is no material dispute that InfoLibria has been wholly in breach of its obligations under Article XII. The circumstances of the provision’s execution are in doubt; and, in any event, whether IMI sat on its hands in the face of InfoLibria’s breach is equally murky. Also, IMI’s notice of termination was not given until December 3, 2003. By that time the Sublandlord was no longer InfoLibria, but rather Duffy Properties.
The purpose for the escrow was to protect IMI in the event of a termination of the Lease, and along with it the Sublease, upon a default caused by an economic collapse by InfoLibria. Such a termination did not occur during the time that InfoLibria was the Sub-landlord. Indeed, given the Court’s conclusion on this argument, it has not terminated yet. So IMI has not been harmed or damaged by InfoLibria’s breach of the Escrow Provisions.
The record tells the Court nothing about Duffy Properties’ financial condition, and consequently nothing about whether IMI has any basis for concern similar to that which was apparent with the start-up, InfoLibria.[4] The Court cannot tell, on the record before it, what Duffy Properties’ financial situation is, and cannot, for that reason, determine whether Duffy Properties’ failure to comply with the Escrow Provisions is one of those kinds of key provision failures that warrants termination under Wesson. It certainly was not a “promise that was a significant inducement to [IMI’s] entering the [Sub]lease in the first instance.” In any event, IMI, as the moving party, bears the burden of affirmatively demonstrating that there is no triable issue of fact on this situation. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). It has not met that burden yet.
For the several reasons discussed above, the IMI Sublease has not terminated, and no declaration to that effect under Count III or determination of a breach under Count I would be appropriate on IMI’s motion.
Duffy Properties’ and Westshell’s Motion for Summary Judgment as to All Counts of the Complaint.
Much of what is included in the discussion above relates to issues the defendants proffer in support of their motion. It does not need to be repeated in great detail.
InfoLibria’s assignment of the Sublease to Duffy Properties was valid. The law in Massachusetts is clear that a lease may be assignable in the absence of a provision in the lease prohibiting the assignment. See Valley Oil Co. v. Barberia, 344 Mass. 759 (1962) (“Leases may be assigned or sublet in the absence of provisions in the lease that this cannot be done. Leitner v. Foster, 280 Mass. 128, 134”). Further, the assignment to Duffy Properties was voluntary. See Applebee’s, supra.
The alter ego argument in the relationship between Westshell and Duffy Properties is without sufficient support factually or legally.
IMI’s attempts to terminate its Sublease warrant comment additional to that above. There were, apparently, two attempts. The first came on November 21,2002, addressed to InfoLibria. The notice, however, was ineffective to accomplish its intended purpose because, contrary to the requirements of the Lease, incorporated into the Sublease, it failed to include a thirty-day cure provision. The second notice, to InfoLibria, Duffy Properties and Westshell, was insufficient for the same reason. Thus, as stated above, the Sublease has yet to be terminated.
There is nothing on the record that shows that IMI is entitled to any relief from its obligations under the Sublease. Consequently, the defendants’ motion for summary judgment should be granted.
ORDER
For the foregoing reasons, the plaintiffs Motion for Partial Summary Judgment (Paper #10) is DENIED, and the defendants’ Motion for Summary Judgment as to All Counts of the Complaint (Paper #16) is ALLOWED. Judgment shall enter for the defendants, including an appropriate declaration on Count III of the complaint.

For reasons not significant for these purposes, the defendants state that the properly is “located at 313 Waverley Oaks Road, Waltham, Massachusetts, presently known as 271 Waverley Oaks Road.”

In making this argument, IMI’s posture has changed from insisting that its Sublease has terminated to insisting it needed protection from that very circumstance occurring.

For reasons already twice noted above, Duffy Properties cannot voluntarily get together with Westshell and terminate the Lease in a way that results in a termination of the Sublease with IMI.