Dye, J.
This is an action for a judgment declaring a directive of the New York City Fire Department relating to Pension Fund contributions to be null and void as to these plaintiffs.
The challenged directive, which took the form of a letter addressed to plaintiff Dunn and others similarly situated, advised them that they were indebted to the Pension Fund *235 account for contribution ‘ ‘ for .your period of retroactive military service during World War II ”, which assessment was to be paid on or before June 30, 1957, either in a lump sum single payment or in 24 equal payments and that failure to pay as directed would [1] ‘ result in the deduction of your military service time from your Fire Department record and service.”
The directive also stated that it was issued for the following reason: “ You are obligated to pay this sum because either (1) retroactive seniority credited to your record has changed your age on entry to the Department and consequently your rate of contribution to the Fund and, because this retroactive seniority has changed the rate of salary on which the new rate of contribution is to be applied or (2) you earned more in the military service than you would have earned in the Fire Department. ’ ’
The essential facts are not in dispute and may be briefly stated:
Dunn passed a Fire Department examination before December, 1941, and thereupon his name appeared on the list of “ eligibles ” awaiting appointment. In January, 1942 he entered military service and on September 16, 1942 an eligible lower on the list than Dunn was appointed. Dunn returned to civilian life in April, 1946 and, pursuant to what is subdivision 7 of section 243 of the Military Law, he was given a preference in appointment, with the result that on July 1, 1946 he began his assignment as a probationary fireman. At the time, that special priority consideration was the only “ veteran’s preference ” Dunn enjoyed with respect to Fire Department employment.
After the usual six-month period of probation, Dunn was privileged to join the Pension Fund as it then existed. That pension plan was, as it still is, basically different from the New York City and the New York State Employees’ Retirement Systems (both of which provide for retirement benefits to accrue upon reaching a fixed age) in that length of service was the determinative factor. Under the Firemen’s Pension Fund system, a member could retire on a lifetime annuity after 20 years of service. The contribution rates of the various members were actuarially computed on the basis of their respective retirement ages, in order to maintain the stability of the reserves. Thus Dunn’s contribution rate was figured on the basis of his *236 life expectancy measured from 1966. A feature of the pension plan which is typical of government retirement systems was that the city paid a percentage of each fireman’s contribution, then fixed at 55%.
At this point it should be noted that certain benefits were accorded to those veterans who had actually served as Fire Department employees prior to the outbreak of World War II. They were given the election of remaining in the retirement system by keeping up their contributions in the customary percentage. And they were also entitled to receive salaries which would include longevity increments accrued during the war (Dunn et al. were not so entitled; see Mulligan v. City of New York, 300 N. Y. 541 [1949]).
The solution of the within controversy turns on the interpretation of the 1947 amendments to section 2431 of the Military Law, which authorized a credit to individual members of the pension system for the years of duty in the military service, the effect being to accelerate the date of retirement by a corresponding period.
Insofar as pertinent, the Military Law of 1947 provides that Dunn, as well as others so situated, would be deemed to have been appointed when his name came up originally, viz., September 16, 1942, “ and shall be entitled to the same benefits in respect to his membership in any system as he would have had if he had been present and continuously engaged in the performance of the duties * * * (4) * * * 0f the position to which he is deemed to have been appointed on the date specified therein, and as if he had actually been appointed and had entered upon the performance of the duties of such position upon such date.”[2] Another change was that for the war years *237 the city was to pay 100% of the contributions required of members of the system.
With the enactment of that legislation, Dunn became eligible for retirement in 1962, approximately four years in advance of the time he would have been eligible without such military credit. This statutory windfall carried with it a serious financial responsibility, namely, maintenance of the retirement fund reserves on an actuarially sound basis with the concomitant problem of who was to pay the deficiency. The Legislature, however, did not expressly indicate the manner or the means by which the fund was to be restored to an actuarially sound basis. The plaintiff Dunn and those he represents have no quarrel with the actuarial necessity for such additional contributions, owing to the crediting of military service, but assert — and so far successfully — that the needed contributions covering the postwar period should be made in whole by the city and not in part by the individual fireman member. The city says that, if the member is entitled to accelerated retirement benefits based on the period of his military service, such member should not complain when required to pay the necessary actuarial cost thereof; in other words, that pension benefits, depending as they do on actuarial computations, should be apportioned between the city and the individual fireman member on the basis of 55% and 45% respectively. In calculating the actuarial deficiency, the city took the date that resulted from the military credit, that is, September 16,1942, as the date of Dunn’s appointment, and it treated others on a like basis. This was theoretical in that Dunn was at that time actually in military service, but for purposes of retirement and pension he was deemed to have been appointed. It thus calculated the amount of his contribution based on his initial salary, to which were added the increments he would have been entitled to for the period of the military credit, so as to make a salary figure equivalent to what he would have received had he actually been in city service at and during the time in question. When the rate formula was applied to this theoretical salary base, a rate was arrived at sufficient to satisfy actuarial requirements permitting retirement on the accelerated date. The computation took time to do. The task was completed in 1950. However, the amount of the deficiency was not figured until 1956 when it was found that *238 Dunn owed $373.32 which — when taken with the others — aggregates $310,000, while the total cost to the city is estimated at $1,218,000. A letter of notification was mailed to each of the firemen involved, directing payment of the calculated deficiency within 24 months. In accordance with the Military Law as amended in 1947, the city paid 100% of the needed contribution for the period of the military credit and apportioned the additional cost for the postwar period. The result was that the actuaries charged Dunn with the deficiencies arising out of the application of the new rate (9.57% as compared with the old rate of 9.31%) to the fictional salary arrived at by including the three annual increments. As noted earlier, Dunn began his employment in July, 1946 at the initial salary, and it was not until 1949 that he actually received the salary based on all the increments. From 1950 on, Dunn paid the new rate into the retirement system. So, the only period involved here is that from 1946 to 1949.
Dunn claims that the change of rate constitutes a violation of • section 7 of article V of the Constitution of the State of New York, which provides that membership in any pension or retirement system of the State or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired. He claims further that his sole obligation to the Pension Fund was to contribute a proportion of only that compensation actually received.
The validity of these claims naturally depends on what the Legislature intended when it enacted the 1947 legislation. It seems reasonable to suppose that the Legislature envisioned no greater benefit than that expressed, viz., an acceleration of the member’s retirement date to the extent of the time he spent in military service. In so doing, the Legislature must be deemed to have had in mind the actuarial consequences and, in particular, the fundamental necessity of maintaining a sound reserve which is an incident to all retirement systems. To be certain that the member would not be financially disadvantaged by the legislative largess, it was also provided that the city should pay 100% of the contribution needed for the period of the war credit and that thereafter the city and the member should resume their initial relation to the fund, that is, that the city should pay 55% and the member 45% of the required annual contribution. To *239 attribute any other intention to the Legislature is to say that it intended to discriminate against those who were members of the system prior to the war and who, by force of circumstances, never qualified for a military service credit under the 1947 enactment. It must be assumed that the Legislature was aware of its duty to treat everyone in the same category alike. In carrying out this obvious legislative intent, the city was under a necessity of implementing it by a recalculation of the rate necessary to maintain an actuarially sound reserve and, to do so, it apportioned the additional cost between the member and itself.
So construed, the statute would not conflict with the Constitution. There is no impairment of contract, but rather a conditioned grant, quite different from the situation in Birnbaum v. New York State Teachers Retirement System (5 N Y 2d 1 [1958]), in which the system attempted to apply a revised mortality rate to existing members.
Dunn also contends, by way of enlargement on the fictional character of the actuaries’ recomputation, that he should be exempt from any contributions for the probationary period (July 1, 1946 through January 1, 1947). The new rate has been applied to the period for the simple reason that such period is necessarily included because the credit for military service was made effective as of September 16, 1942. A recognition of the need for adopting some mathematical method for computing the correct rate-of-contribution figures is the sanction for all the small inconsistencies which ensue from the workings of that method. What is important is that the end product conforms with realities and obvious legislative intent.
Notwithstanding the circumstance that membership in the system is in the nature of a contract, ‘[1] the benefit of which shall not be diminished or impaired ” (N. Y. Const., art. V, § 7), such membership does not operate to give Dunn a vested interest in the maintenance of a rate based on factors not considered in light of the subsequently conferred benefit. When the Legislature gave members a credit for their military service and thereby accelerated the retirement date, it gave a benefit which was necessarily conditioned on a revision of the obligations and responsibilities of the respective parties.
The judgment of the Appellate Division should be reversed, with costs in all courts, and the matter remitted to Special Term *240 for the entry of a declaratory judgment in favor of the defendants.
Chief Judge Conway and Judges Desmond, Fuld, Froessel, Van Voorhis and Burke concur.
Judgment of Appellate Division reversed, with costs in all courts, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.

. (Subd. 7-b, as amd. by L. 1947, eh. 471, eff. March 27, 1947 and subd. 20, par. B, added by L. 1947, ch. 793, eff. April 11, 1947.)

. Subdivision 20 went on to provide: “E. Upon the death or retirement of a New York City member, but not otherwise, the city of New York shall pay into the appropriate fund of the system in which such member held membership at the time of his death or retirement, the amount of all contributions which such member would have been required to make if, during the period of his military duty, he had been present and had continuously performed the duties of the position or positions with respect to which his rights and benefits during the corresponding period or portion thereof are determined ° • *. Each such member shall be credited with such contributions paid in his behalf by such city * * * for all pension or retirement purposes”.