OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Retirement. Contract,* What constitutes, Retirement. *Constitutional Law,* Obligation of contracts, Due process of law, Police power, Retirement. *Words,* "Contract," "Gratuity."

Review of expressions by this court of the power of the Legislature to change the terms of a retirement benefits system for government employees when no statute establishing membership in the system as a contractual relationship applied. [856-858]

St. 1956, c. 525, amending G. L. c. 32, § 25 (5), and establishing a "contractual relationship" with government employees who are members of the retirement system in respect to retirement for superannuation, means at least that the "contract" is formed when a person becomes a member by entering the employment, and he is entitled to have the level of rights and benefits then in force preserved in substance in his favor without modification downwards. [858-863]

Proposed legislation to amend G. L. c. 32, § 22 (1) (b), by increasing from five to seven per cent the amount to be withheld from the regular compensation of government employees who became members of the contributory retirement system before the stated effective date of the act, January 1, 1974, without adding corresponding benefits for such

members, was presumptively invalid under the impairment-of-contract, and the due process clauses of the Constitution of Massachusetts and of the Federal Constitution, in the absence of any indication of a situation calling into play an exercise of the police powers reserved to the Commonwealth. [863-866]

Proposed legislation to amend G. L. c. 32, § 22 (1) (b), by increasing from five to seven per cent the amount to be withheld from the regular compensation of government employees who become members of the contributory retirement system on or after the stated effective date of the act, January 1, 1974, would be constitutional. [866]

On October 30, 1973, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court submit the following reply to the questions set forth in the order adopted by the House of Representatives on September 11, 1973, and transmitted on September 14, 1973.

1. *Summary of the order.* The present order relates to a bill, House No. 7409, as reported by the Committee on Ways and Means, and certain proposed amendments thereto, pending in the General Court. The subject matter is the contributory retirement system for employees of the Commonwealth or subdivisions delineated in G. L. c. 32, §§ 1-28. The bill as reported has two distinct features. First, members of the retirement system who are veterans (as defined), having at least twenty years accumulative service in the government, could obtain "creditable" service up to four years military service performed — which would have the effect of enhancing their ultimate benefits — on making certain contributions for an equivalent number of years in addition to their regular contributions. §§ 1,3. Second, § 2 of the bill would increase from the present five per cent to seven per cent the rate of withholdings from the regular compensation of government employees who are or will hereafter become members of the retirement system. These withholdings represent the members' contributions to the funding of the system, the balance required being furnished by govern-

ment appropriations.

The House makes no inquiry as to the provision for veterans, but as to the far-reaching § 2 it asks whether that section, if enacted, would be constitutionally valid notwithstanding G. L. c. 32, § 25 (5), establishing membership in the retirement system as a contractual relationship under which the rights of members from time to time retired for superannuation are guarded against impairment as there set forth.

The proposed amendments to House No. 7409, besides changing the title of the bill, would state that § 2 shall apply only to persons entering government service after January 1, 1974 (§ 3A), and would declare that it was the intent of the General Court to provide funds to reduce appropriations required for the payment of contributory pensions (§ 5).

The House asks whether § 2 would be constitutionally valid if given only the prospective operation just indicated.

2. *Details of the order.* The specific questions put are:

"1. Is it constitutionally competent for the General Court to enact legislation increasing from five (5) to seven (7) per cent, as provided in Section 2 of said bill, the amount to be withheld from the regular compensation of employees of governmental units who are presently members of the contributory retirement system, notwithstanding the provisions of subdivision (5) of Section 25 of Chapter 32 of the General Laws which established the contractual rights and obligations of certain members and governmental units in contributory retirement systems and protected such rights from impairment?

"2. Would the enactment of such legislation alter the nature and legal effect of an existing contract depriving said employees of property, privilege or estate without due process of law in violation of Articles 1, 10 and 12 of the Declaration of Rights of the Constitution of Massachusetts?

"3. Would the enactment of such legislation destroy or impair the obligation of a contract protected by Article 1,

section 10 of the Federal Constitution?

"4. Would the enactment of such legislation deprive said employees of property rights in contravention of Article 14 of the Amendments to the Federal Constitution?

"5. Would it be constitutionally competent for the General Court to enact House No. 7409 if the provisions of Section 2 were to apply only to persons first employed by the Commonwealth or a political subdivision after January 1, 1974?"

The text of House No. 7409 is as follows:

"AN ACT RELATIVE TO ESTABLISHING THE VETERANS' RETIREMENT ACT OF NINETEEN HUNDRED AND SEVENTY-THREE.

*"Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*
"SECTION 1. The third subparagraph (h) of subdivision (1) of section 4 of chapter 32 of the General Laws is amended by adding the following sentence: — Any member who is a Massachusetts veteran as defined in section (1) having not less than twenty years accumulative service in the commonwealth or any of its political subdivisions shall be granted creditable service up to four years military service performed.

"SECTION 2. Subdivision (1) of section 22 of chapter 32 of the General Laws, as most recently amended by chapter 1012 of the acts of 1971, is hereby further amended by striking out paragraph (b) and inserting in place thereof the following paragraph: — [*]

"(b) The treasurer or other disbursing officer in charge of payrolls in any governmental unit to which a system pertains, and the treasurer or other disbursing officer in charge

---

[*] [Justices' note] The only change made by the amendment of paragraph (b) would be to strike out "five per cent" and substitute "seven per cent."

of payrolls in any free public library the employees of which are eligible for membership in a system, shall, upon written notice from the board, withhold on each payday seven per cent of the regular compensation of each employee who is a member in service of the system, which is received on such day by such member on account of service rendered by him on or after January first, nineteen hundred and forty-six, and not later than the date of his attaining the maximum age for his group; provided, that in the case of any teacher such withholding shall be made upon written notice from the school committee, board of trustees or other employing authority, to the treasurer or other disbursing officer of the political subdivision by which such teacher is employed; and provided, further, that in the case of any person in the service of any institution or school in the department of mental health, the department of public health or the department of public welfare whose employment is not subject to chapter thirty-one and the rules and regulations made thereunder such withholding shall be made on account of salary payments during the first six months of service, but shall be held in escrow by the payroll authority until completion of said six months and, if employment terminates prior to completion of said six months, employing authorities are hereby authorized to make the proper refunds.

"SECTION 3. Any veteran eligible for creditable service pursuant to section one of this act shall pay in addition to his regular retirement contribution an amount equal to seven per cent of the starting salary of such position commencing with the year 1970 for each year of creditable service so desired.

"SECTION 4. The provisions of this act shall take effect of [*sic*] January 1, 1974."

The proposed amendments to House No. 7409 read thus:

"Inserting after section 3 the following section:

" 'SECTION 3A. Section two of this act shall apply only to persons who enter the service of the commonwealth or a

political subdivision thereof on and after January first, nineteen hundred and seventy-four.'.

"By adding at the end of the bill the following section:

" 'SECTION 5. It is the intent of the general court to provide funds to reduce appropriations required for the payment of contributory pensions.'.

"By striking out the title and inserting in place thereof the following title 'An Act providing creditable service for certain veterans under the contributory retirement system, and increasing the contributions required by all employees of said system.'."

Section 25 (5) of G. L. c. 32 states:

"The provisions of sections one to twenty-eight, inclusive, and of corresponding provisions of earlier laws shall be deemed to establish and to have established membership in the retirement system as a contractual relationship under which members who are or may be retired for superannuation are entitled to contractual rights and benefits, and no amendments or alterations shall be made that will deprive any such member or any group of such members of their pension rights or benefits provided for thereunder, if such member or members have paid the stipulated contributions specified in said sections or corresponding provisions of earlier laws."

3. *Impact of a general increase in the rate of withholdings.* This court has referred to the "great complexity" of the provisions of chapter 32 of the General Laws dealing with the subject of retirement of government employees and related topics.[1] Only the barest outline of the features of the retirement system relevant to the present opinion can be given here.

Administration of the retirement system is largely in the hands of over a hundred retirement boards severally covering groups of State employees or employees of particular coun-

---

[1] *Boston Retirement Bd.* v. *McCormick,* 345 Mass. 692, 695 (1963).

ties, cities, towns, districts or authorities, with two boards — the State Board of Retirement and the State Teachers' Retirement Board — having by far the largest numbers of employee-members. With some variations, however, the system is uniform in its application to all these boards and their members. The system is predominantly "compulsory" and "contributory": most employees join the system automatically as the governmental unit which they serve accepts it, and they contribute to it by means of deductions automatically made from their salaries. Since the revamping of the system in 1945 (St. 1945, c. 658, § 1), the rate of deductions has been fixed at five per cent of salary. The participating governmental units by annual appropriations, on a pay-as-you-go basis, furnish the rest of the wherewithal, that is, such amount as is required, over and above the contributions of members (augmented by investment), to meet the legal obligations of the system, the amount being determined yearly by the actuary in the Commonwealth's Department of Banking and Insurance.

The legal obligations of the system consist of liabilities for a spectrum of retirement and similar benefits including benefits upon retirement of members for superannuation or for ordinary or accidental disability, as well as benefits in the form of termination allowances in certain cases of resignation of members, failure of reëlection or reappointment, removal, or discharge.

The arrangements concerning retirement for superannuation are central to the system and are digested here. During the period of his employment the member will have made his contributions through deductions from his salary at the five per cent rate and these contributions and those of other members will have been earning further sums through investment.[2] When age, term-of-service, and other qualifications are met, the member retires with benefits. The normal yearly amount of his retirement allowance is computed on the basis

[2] A member may choose to make additional contributions up to a certain limit in order to increase his ultimate benefits.

of age at retirement, years of "creditable" service with the government-employer, job grouping, and average rate of compensation over a prescribed period, with certain stated additions, for example, for veterans' status and "cost of living" increases, and with certain maximum limits. The computation results in a dollar amount as the normal yearly allowance. It is worked out mathematically without reference to how much of the allowance so determined represents funding through the member's own contributions, and how much is to be supplied by government appropriations.

A member has a choice as to how his allowance shall be paid. Under option (a), he simply receives the normal yearly allowance for the rest of his life with no provision for any continuation of payments to survivors. As for the bookkeeping internal to the system, the accumulated deductions from the member's salary are used to provide an actuarial equivalent in the form of a regular life annuity for the member (the annuity share of the allowance). The governmental unit is responsible for the usually considerable difference needed to make good the normal yearly allowance paid to the member until his death (the pension share).

Under option (b), the member receives an amount somewhat less than the normal yearly allowance until death but there is provision for surviving beneficiaries. The salary deductions are here used for a cash refund life annuity. If the member dies before the end of his predicted term, a lump sum, representing in effect the difference between the value of the salary deductions and the annuity share of the allowances actually paid to the member, goes to the survivors.

Option (c), a "joint and last survivor" option, yields a much reduced yearly allowance to the member after retirement until death, but provides that two-thirds of that allowance shall continue to be paid during the lifetime of his surviving eligible beneficiary. Again a pension share complements the share funded by the member's contributions through salary deductions.[3]

---

[3]There is an option (d) which may be chosen with any of the others and provides for an allowance to a designated beneficiary if the member dies before retiring.

The impact on the superannuation retirement category of a raise in salary deductions from five to seven per cent can now be appreciated. Considering option (a), the change would mean a forty per cent increase of the member contributions providing the annuity share of the yearly allowance, and a comparable decrease in the pension share furnished by government, for the pension share represents roughly the difference between what the member has created in the way of an annuity and the fixed yearly retirement allowance to which he is entitled. The member would pay more without any enlargement of the benefits. In essence the same is true of the other options. The general effect of § 2 of House No. 7409 is indeed plainly indicated in § 5, proposed as an amendment to the bill: "It is the intent of the general court to provide funds to reduce appropriations required for the payment of contributory pensions." This is done by increasing the members' contributions without substantially altering the current benefits, i.e. the amounts being paid out to members.

As the superannuation category is at the heart of the system and of the questions put by the House, we say only a word about other categories of chapter 32. For ordinary disability (nonveterans), and generally for terminations, an increase in the members' contributions would apparently have like effect in requiring members to put in more money without thereby enhancing the benefits to themselves. With regard to ordinary disability (veterans) and accidental disability and accidental death, the steeper contributions by members would not in general relieve the government, since the government's share in those categories is based on a fixed percentage of the member's rate of pay over a given period of time; the effect would rather be a forced increase in both the member's investment in and return of those benefits.

We add as a matter of common knowledge that the level of retirement allowances to members has risen over the years as

In certain circumstances a member is entitled to a return of his contributions.

the result not only of the higher salaries entering into the computation formulas but of favorable legislative decisions like that proposed for veterans in the present bill. Appropriations have correspondingly mounted.[4]

4. *Nature of the "contractual relationship" of G. L. c. 32, § 25 (5).* It is convenient to start with the view that this court has expressed in the past about the Legislature's power to change the terms of a retirement benefits scheme when, no statutory provision such as § 25 (5) has been applicable.

In *Foley* v. *Springfield,* 328 Mass. 59 (1951), the court said that benefits under a noncontributory retirement scheme —one in which the government footed the entire cost — were merely "gratuities" or "expectancies" rather than "contractual obligations" (328 Mass. at 61), and therefore the Legislature could abrogate them at will. Cf. *Coakley* v. *Attorney Gen.* 318 Mass 508 (1945). The statute under attack, amending the existing scheme, cut down in certain events the stated pensions payable to members in case they accepted and had earnings from outside employment after their retirement; in the particular instance the member had already retired when the statute was passed. In *Kinney* v. *Contributory Retirement Appeal Bd.* 330 Mass. 302 (1953), the same attitude was taken toward a phase of a chapter 32 contributory retirement scheme: it was competent for the Legislature to reduce benefits payable to a member, and this without regard to whether the member had already fulfilled the conditions upon which those benefits would become due at the time the amendatory law went into effect. The amendment — changing the provision in force when the member entered the system and when he made the relevant contributions — declared that time of service as an elected representative in the General Court should not count as "creditable" service. The court aligned itself with those decisions

---

[4]A short account of the system appears in Report of the Special Commission to Make an Investigation and Study of the Retirement Age and Allowances for Employees of the Commonwealth, Cities and Towns (1973 House No. 5900), pp. 12-18.

in other jurisdictions, taken by the court to represent the numerical weight of authority, which treated compulsory contributory[5] plans as not different from noncontributory plans, and held that none was to be read as establishing a contractual relationship vesting rights that were constitutionally protected against subsequent destructive legislation. To say that a member "contributed" to a plan by salary deductions was merely another way of saying — so it was suggested — that his salary was less than the stated amount, and the retirement benefits under the plan were still State-granted gratuities. One Justice dissented from the judgment of the court. As he later explained,[6] he believed the assimilation of contributory with noncontributory plans was not supported by a preponderance of the decided cases, and he evidently saw practical reasons for a difference. *Roach* v. *State Bd. of Retirement,* 331 Mass. 41 (1954), resembled the *Kinney* case; and in *McCarthy* v. *State Bd. of Retirement,* 331 Mass. 46 (1954), the court held that it did not matter that the member was actually receiving his retirement benefits when the statute was passed denying him "creditable" service for his period in the General Court.[7]

The last case in this series was *Smolinski* v. *Boston Retirement Bd.* 346 Mass. 210 (1963), where the situation was similar to that in the *Foley* case except that the system was a compulsory contributory one under chapter 32 and the benefits were those arising not upon superannuation but disability. The court said again that — putting § 25 (5) to one side, as inapplicable[8] — members could not complain of impairment.

---

[5]In fact the member in the *Kinney* case was not required to make the contributions applicable to his time in the General Court but rather had an option to make them, whereupon that time was counted as "creditable" service. The court brushed over this fact. 330 Mass. at 306 (1953).

[6]In the *Roach* case, cited next in the text, 331 Mass. 41, 45 (1954).

[7]The Court reserved the question whether the member could recover his contributions related to his time in the General Court. For remedial legislation on the point, see St. 1954, c. 615.

[8]Because the retirement was for disability, not superannuation. See 346 Mass. at 212 (1963). In the prior *Kinney, Roach,* and *McCarthy* cases, § 25 (5) (before its

As is suggested by the disagreement of the Justices on the *Kinney* problem, the law in this country defining the character of retirement plans for public employees was not settled at the time (indeed it remains unsettled today). There was growing realization that public employees look upon pension and similar benefits as in substance delayed compensation for their services, and rely on these benefits as a security against destitution in their old age and against catastrophe. Government, on the other hand, sees retirement plans as a necessary means of attracting able workers who will remain on the job for the long run. These practical understandings have been reflected in court decisions characterizing retirement benefits as earnings rather than gratuities, and the plans as "contractual." See annotation, 52 A.L.R. 2d 437 (1957). The *Kinney, Roach,* and *McCarthy* cases in the mid-1950's might thus have been expected to raise serious questions not only among government employees but their employers as well.

A Special Commission to Study and Revise the Laws Relating to Retirement Systems and Pensions had been created in 1951 (Res. 1951, c. 52, Res. 1953, c. 807) and was at work when those cases were decided. The Final Report of the commission in 1955 (House No. 2500) reflects the dissatisfaction with the decisions (pp. 40, 106-107). The commission, however, was divided on what to do. A majority was prepared to add contractual language to § 25 (4) (to be entitled "Guaranty of Allowance by Governmental Unit"), but not to alter materially § 25 (5) as it then stood. (See pp. 18, 40-41, 232.) Section 25 (5) then allowed alteration from time to time or repeal of the basic provisions of chapter 32, but not so far as to reduce the amount of any annuity, pension, or retirement allowance previously granted, or to affect adversely benefits accrued to members by reason of previous contribu-

---

amendment in 1956) was inapplicable because the plans were not under §§ 1-28, mentioned in § 25 (5), but under other sections of c. 32. Section 25 (5) was not at all pertinent to the *Foley* case, see 328 Mass. at 62 (1951).

tions and service.[9] Thus for members on the job, benefits for the future could be reduced without limit. A minority of the commission was not content with this narrow assurance to members. The minority wanted a full acceptance of the contractual idea, and referred to a New York constitutional provision in that style.[10] (See pp. 105-108.) It proposed legislation (substituting for both § 25 [4] and [5]) which would establish membership as a contractual relationship and entitle a member to the benefits provided from time to time during the period of his service without diminution by subsequent alteration or repeal; but an employee becoming a member after such a change would take subject to it.[11] This envisaged the progressive vesting from time to time during a member's service of increasing benefits as they might be provided by the Legislature.

A spate of bills was introduced by various hands in 1955-1956,[12] from which emerged St. 1956, c. 525, amending § 25 (5); there has been no change in the text since 1956. Amended § 25 (5) definitely leans toward the minority pro-

[9]Prior to amendment in 1956, § 25 (5) stood thus: *"Effects of Amendments or Repeal.* . . . The provisions of sections one to twenty-eight inclusive may be altered or amended from time to time or may be repealed; provided, that no such alteration, amendment or repeal shall be deemed to reduce the amount of any annuity, pension or retirement allowance granted under the provisions of such sections or under corresponding provisions of earlier laws prior to the date any such alteration, amendment or repeal becomes effective, or to affect adversely the rights of any person who is a member on such date, with reference to total deductions previously made or benefits accrued on account of any service rendered by him prior thereto."

[10]N. Y. Const. art. V, § 7: "After July first, nineteen hundred and forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired."

[11]The proposed language was as follows (p. 108): "The provisions of this chapter and of corresponding provisions of earlier laws shall be deemed to establish membership in a retirement system as a contractual relationship under which a member shall be entitled as a matter of contractual right to the benefits from time to time provided during the period of his service without diminution or impairment by any alteration, amendment or repeal of the provisions fixing such benefits; but this provision shall not prevent the application of any such alteration, amendment or repeal to persons becoming members after the effective date thereof."

[12]The bills are cited in the *Smolinski* case, 346 Mass. at 212 (1963).

posal, but detached from its background this provision is not altogether clear. It has not been interpreted by the court except for a remark in the *Smolinski* case that it does not range beyond superannuation but applies both retroactively and prospectively to members retired for that reason. 346 Mass. at 213 (1963).

An advisory opinion which does not follow full debate[13] and is not addressed to concrete cases is hardly the occasion to attempt a complete elucidation of the statutory language, an elucidation which could not be authoritative in any event. *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 245, n. 1 (1946). Still we think the following can be fairly said. The first, and dominating, clause of § 25 (5), akin to the New York constitutional provision quoted in n. 10, overcomes the "gratuity" thesis and imports a "contractual relationship." The minimal meaning of this change is that the "contract" is formed when a person becomes a member by entering the employment, and he is entitled to have the level of rights and benefits then in force preserved in substance in his favor without modification downwards. Anything short of this interpretation would result in an approximation of the pre-1956 version of § 25 (5), and render the 1956 amendment aimless and nugatory. When we speak of the level of rights and benefits protected by § 25 (5) we mean the practical effect of the whole complex of provisions not excluding the deductions, as an increase in deductions is little different from a diminution of the allowance.[14] There is a further interpretive question harder to resolve: whether a

[13]The court issued an invitation to any interested parties to file briefs, with a specific invitation to named officials and organizations which might among them espouse both sides of the question. However, the only briefs filed (for which we express thanks) were on behalf of the American Federation of State, County and Municipal Employees, AFL-CIO, Massachusetts State Employees Association, and Massachusetts Teachers' Association, all arguing that the increased rate of withholdings should be declared invalid.

[14]One of the briefs argues that the reference in § 25 (5) to the "stipulated contributions" preserves the five per cent rate beyond change in all circumstances. On the other hand it may indicate simply and obviously that ultimate payment of allowances is tied to the fulfillment of the contributions.

member is protected in additional benefits that may be legislated from the date of his becoming a member to the time of his retirement — i.e. whether the viewpoint of the minority of the commission was fully adopted. To this matter we return below.

"Contract" (and related terms such as rights, benefits, protection) should be understood here in a special, somewhat relaxed sense. The label "gratuity" could never have been taken with sober literalness,[15] and so also for "contract." It is not really feasible — nor would it be desirable — to fit so complex and dynamic a set of arrangements as a statutory retirement scheme into ordinary contract law which posits as its model a joining of the wills of mutually assenting individuals to form a specific bargain. As the commentators show, a retirement plan for public employees does not readily submit itself to analysis according to Professor Williston's canons. See Note, Contractual Aspects of Pension Plan Modification, 56 Col. L. Rev. 251, 253-263 (1956); Cohn, Public Employee Retirement Plans — The Nature of the Employees' Rights, 1968 U. of Ill. L. Forum 32, 42-46; cf. *Spina* v. *Consolidated Police & Firemen's Pension Fund Commn.* 41 N. J. 391, 401 (1964). When, therefore, the characterization "contract" is used, it is best understood as meaning that the retirement scheme has generated material expectations on the part of employees and those expectations should in substance be respected. Such is the content of "contract."

It is true that a few cases that adopt the label of "contract" have approached the terms of a retirement plan as they would a bond indenture,[16] but closer to the realities is

[15]Thus a jurisdiction holding that benefits were "gratuities" might still hold that rights were somehow fixed or vested when the member in fact retired or fulfilled all conditions to retirement. Cf. *Pennie* v. *Reis,* 132 U. S. 464, 471 (1889).

[16]A strict adherence to ordinary contract notions appears in *Yeazell* v. *Copins,* 98 Ariz. 109 (1965); see the dissent at 118, and discussions of the case in 9 Utah L. Rev. 1052 (1965); 9 B. C. Ind. & Commercial L. Rev. 380 (1966); 70 Dickinson L. Rev. 524 (1966); 35 U. of Cinn. L. Rev. 90 (1966). See concurring opinion of Ott, J., in *Eisenbacher* v. *Tacoma,* 53 Wash. 2d 280, 286 (1958).

the view that "contract" protects the member of a retirement plan in the core of his reasonable expectations, but not against subtractions which, although possibly exceeding the trivial, can claim certain practical justifications. Attention should then center on the nature of these justifications in the light of the problems of financing and administering these massive plans under changing conditions.

Decisions in California (as well as in other States) take just this view of the nature of the "contract." From 1947 onward the Supreme Court of California passed from a "gratuity" to a "contract" position (without the aid of any such statute as our § 25 [5]). See *Kern* v. *Long Beach,* 29 Cal. 2d 848, 853-856 (1947); *Allen* v. *Long Beach,* 45 Cal. 2d 128, 133 (1955). Summing up the attitude of that State as it has evolved, an intermediate appellate court said in *Wisley* v. *San Diego,* 188 Cal. App. 2d 482, 485-486 (1961): "Where a city charter provides for pensions, it is well settled that the pension rights of the employees are an integral part of the contract of employment and that these rights are vested at the time the employment is accepted. An amendment to the charter which attempts to take away or diminish these vested rights is an unconstitutional impairment of contract. However, this does not preclude reasonable modifications of the pension plan prior to the employees' retirement. Reasonable modifications are often necessary in order that the pension system may be kept flexible, to permit adjustments in accord with changing conditions and to maintain the integrity of the system in order to carry out its beneficent purpose. . . . To be sustained as reasonable, alterations of the employees' pension rights must bear some material relationship to the theory of a pension system and its successful operation, and changes which result in a disadvantage to the employees should be accompanied by comparable new advantages. . . . The validity of attempted changes in vested pension rights depends upon the advantage or disadvantage to the individual employee whose rights are involved, and benefits to other employees cannot offset detriments imposed upon

those whose pension rights have accrued."[17] See *Bakenhus* v. *Seattle,* 48 Wash. 2d 695, 698 (1956).

We think the "contractual relationship" envisaged by § 25 (5) has similar tolerances.[18]

5. *Validity of proposed increase of rate of deductions.* The contract so envisaged is under the shelter of the impairment-of-contract clause, or, what amounts to much the same thing,[19] the due process clause of the Federal Constitution and State constitutional provisions cognate to the latter. The Supreme Court of the United States early held that a retirement plan, if fairly interpreted as involving mere gratuities or expectancies, could be whittled away by the State, see *Pennie* v. *Reis,* 132 U. S. 464, 471-472 (1889),[20] and this court took the same position in its 1951-1954 gratuity cases cited above. On the other hand, a retirement plan establishing a contractual relationship invites a different analysis and whether viewed strictly as contract or as property may be constitutionally guarded against impairment. See *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95 (1938); *Lynch* v. *United States,* 292 U. S. 571, 578-579 (1934); cf. *Campbell* v. *Boston,* 290 Mass. 427 (1935). But it is basic that the State reserves police powers that may in a particular predicament enable it to alter or abrogate even conventional contractual rights. See *Massachusetts Port Authy.* v. *Treasurer & Recr. Gen.* 352 Mass. 755, 762-763 (1967); *El Paso* v. *Simmons,* 379 U. S. 497 (1965); *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 434-435 (1934).

---

[17]For a somewhat variant expression, see the *Kern* case, 29 Cal. 2d at 855 (1947).

[18]An alternative analysis, which language in the California and other decisions may support, is that the State's police power can readily be used to sustain legislation overriding the precise terms of a retirement plan in order to achieve actuarial soundness or the like. Compare the discussion of police power below, and *El Paso* v. *Simmons,* 379 U. S. 497 (1965).

[19]See *Massachusetts Port Authy.* v. *Treasurer & Recr. Gen.* 352 Mass. 755, 763 (1967); *Opinion of the Justices,*261 Mass. 523, 553 (1927).

[20]See also *Phelps* v. *Board of Educ. of West N. Y.* 300 U. S. 319 (1937); *Dodge* v. *Board of Educ. of Chicago,* 302 U. S. 74 (1937).

The *Pennie* case is explained in *Kern* v. *Long Beach,* 29 Cal. 2d at 854 (1947).

Legislation which would materially increase present members' contributions without any increase of the allowances finally payable to those members or any other adjustments carrying advantages to them, appears to be presumptively invalid — invalid, that is to say, unless saved by the reserved police powers. Whether a situation of stress exists here sufficiently serious to call those powers into play and save the legislation is a question grounded ultimately in fact, not to be resolved in an advisory opinion. It is, however, instructive in this connection to note that in *Allen* v. *Long Beach,* 45 Cal. 2d 128 (1955), a statute simply increasing the contributions of public employees to a retirement plan from two to ten per cent of salary was denied enforcement. The change lay outside the "contract," as it was not shown to bear a reasonable relation to the successful functioning or integrity of the plan. And no extraneous facts had been brought forward sufficient to palliate or excuse the impairment of members' rights. It is true that the statute in question had further features also unfavorable to the members, but it appears likely that the court would have invalidated the statute even if it had contained only the provisions for increase of members' contributions. See *Glaeser* v. *Berkeley,* 148 Cal. App. 2d 614, 617 (1957). Increases in members' contributions without corresponding benefits were similarly treated in *Wisley* v. *San Diego,* 188 Cal. 2d 482 (1961). We note in the margin further decisions proceeding on the same basis but involving other kinds of modifications of retirement plans materially diminishing members' rights.[21] That the maintenance of a retirement plan is heavily burdening a governmental unit has not itself been permitted to serve as justification for a scaling down of benefits figuring in the "contract," although no case presenting proof of a catastrophic condition of the public finances has been put. See *Abbott* v. *Los Angeles,* 50 Cal. 2d 438, 455 (1958); *Phillis* v. *Santa Barbara,* 229 Cal. App. 2d 45, 65-66 (1964). It should be added

---

[21]*Kern* v. *Long Beach,* 29 Cal. 2d 848 (1947). *Abbott* v. *Los Angeles,* 50 Cal. 2d 438 (1958). *Cochran* v. *Long Beach,* 139 Cal. App. 2d 282 (1956). *Glaeser* v. *Berkeley,* 148 Cal. App. 2d 614 (1957). *Chapin* v. *City Commn. of Fresno,* 149

that the Legislature's opinion that justification does in fact exist for the modification of a plan is entitled to judicial respect; especially so if that opinion is buttressed by prior formal investigation of the facts.

What has been said about the presumptive invalidity of the proposed increase in the rate of members' contributions applies most clearly to members who entered the retirement system at approximately its present level of benefits for them (and while § 25 [5] in its present form was on the statute book). But there may be other members who entered when the level was lower and who have been the recipients of step-by-step enlargements of retirement rights and benefits through favorable legislation over the years. We revert to the question whether they can claim impairment if the proposed change of the rate of contribution, while worsening their current situation, does not reduce them in net effect below the level at which they entered the system. If they can claim impairment, the question would remain whether, in considering the seriousness of the impairment as related to a claimed justification for it, the government is conceivably entitled to any credit (so to speak) for its past indulgences to those members. One sees in the decisions a tendency to compare the situation just before the proposed reduction of benefits with that which would exist afterwards, without much if any consideration of the significance of a progressive increase of benefits in the past: perhaps the courts implicitly assume that there are corresponding enhancements of the members' just expectations. But the problem has not been analyzed ex-

Cal. App. 2d 40 (1957). *Abbott v. San Diego,* 165 Cal. App. 2d 511 (1958). *Phillis* v. *Santa Barbara,* 229 Cal. App. 2d 45 (1964). *Birnbaum* v. *New York State Teachers Retirement Sys.* 5 N.Y. 2d 1 (1958). *Kranker* v. *Levitt,* 30 N.Y. 2d 574 (1972). *Cashman* v. *Teachers' Retirement Bd.* 193 Misc. (N. Y.) 57 (1948), affd. 275 App. Div. (N. Y.) 908 (1949), affd. 301 N. Y. 501 (1950). *Matter of Ayman* v. *Teachers' Retirement Bd. of New York,* 19 Misc. 2d (N. Y.) 355 (1959), order recalled, 19 Misc. 2d (N. Y.) 374 (1959), affd. 10 App. Div. 2d (N. Y.) 835 (1960), mod. and affd. 9 N. Y. 2d 119 (1961). *Bakenhus* v. *Seattle,* 48 Wash. 2d 695 (1956). *Eisenbacher* v. *Tacoma,* 53 Wash. 2d 280 (1958).

For modifications held lawful because detriments to members were considered to be offset by advantages, see *Houghton* v. *Long Beach,* 164 Cal. App. 2d 298 (1958); *Lyon* v. *Flournoy,* 271 Cal. App. 2d 774 (1969), app. dism. for want of a substantial Federal question, 396 U. S. 274 (1970).

haustively, and we can do no more than advert to it in the absence of concrete states of fact. See *Abbott* v. *Los Angeles,* 50 Cal. 2d 438 (1958); *Glaeser* v. *Berkeley,* 148 Cal. App. 2d 614 (1957); *Kranker* v. *Levitt,* 30 N. Y. 2d 574 (1972). It may be noted that the Legislature has means of preventing a given increase of benefits from becoming vested if it takes due precautions at the time.[22]

6. *Validity of proposed increase of rate with respect to prospective employees.* The House inquires about the constitutionality of legislation applying the increased rate of deductions from compensation not to present members but only to those persons who will become members after January 1, 1974. We see no constitutional difficulty with such a provision. The expectations of a member safeguarded by § 25 (5) have their origin in the terms of the plan as they apply to him when he enters upon employment and becomes a member, not in other terms not addressed to him. See *Birnbaum* v. *New York State Teachers Retirement Sys.* 5 N. Y. 2d 1, 11 (1958); *Kranker* v. *Levitt,* 30 N. Y. 2d 574, 575 (1972). Nor does it seem that a distinction in the applicable terms between present and future members would be arbitrary or discriminatory in a constitutional sense. However, the § 25 (5) "contractual" regime would — nothing being legislated to the contrary — attach to the new member from the date he joins at the level made applicable to him.

7. *Conclusions.* Question 1 is answered "No," meaning that such legislation is presumptively invalid in the sense indicated in the body of this opinion. Questions 2-4 are sever-

---

[22]The granting of new benefits can be conditioned on their not entering into a formula on which a retirement allowance is calculated; see *Rosen* v. *New York City Teachers' Retirement Bd.* 282 App. Div. (N.Y.) 216, affd. 306 N.Y. 625 (1953), or conditioned in other ways. See *Dunn* v. *New York,* 7 N.Y. 2d 232 (1959). See also *White* v. *Hussey,* 275 App. Div. (N.Y.) 714 (1949).

It is accepted that the fact that a retirement system is "contractual" does not in itself prevent changes of salaries and abolition of jobs, even though such actions will affect retirement allowances. *Hoar* v. *Yonkers,* 295 N. Y. 274 (1946). *Gorman* v. *New York,* 280 App. Div. (N. Y.) 39 (1952), affd. 304 N. Y. 865 (1952), remittitur amended, 304 N. Y. 973 (1953), app. dism. for want of a substantial Federal question, 345 U. S. 962 (1953).

ally answered "Yes," with the same qualification. Question 5 is answered "Yes."

G. Joseph Tauro
Paul C. Reardon
Francis J. Quirico
Robert Braucher
Edward F. Hennessey
Benjamin Kaplan
Herbert P. Wilkins