STEWART E. HALPIN ET AL., APPELLANTS, v. THE
NEBRASKA STATE PATROLMEN'S RETIREMENT SYSTEM
ET AL., APPELLEES.

320 N.W.2d 910

Filed June 18, 1982. No. 44186.

Dwyer, O'Leary & Martin, P.C., and Steven E. Achelpohl, for appellants.

Paul L. Douglas, Attorney General, and Ralph H. Gillan, for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

BOSLAUGH, J.

The plaintiff Stewart E. Halpin was a member of the Nebraska State Patrol from October 15, 1947, until December 31, 1979, when he retired from the State Patrol. He is a member of the Nebraska State Patrolmen's Retirement System and is receiving benefits as a retired patrolman. He brought this action on his own behalf and on behalf of every present member of the patrol who was a member prior to

January 4, 1979, and every retired patrolman who retired on or after January 4, 1979, and is receiving benefits under the retirement system.

The plaintiffs sought a declaratory judgment that the final average monthly salary of a retiring patrolman should include the lump sum payment received for accumulated but unused vacation and sick leave.

Upon retirement a patrolman is entitled to receive an annuity which is a percentage of his final average monthly salary. Final average monthly salary is defined by statute as the sum of the patrolman's total salary during his final 3 years of service divided by 36. Neb. Rev. Stat. § 60-452.01 (Reissue 1978). From 1969 until January 4, 1979, the final average monthly salary of a patrolman was calculated by including the payment received for unused vacation and sick leave.

Commencing January 4, 1979, a patrolman's final average monthly salary was calculated by excluding the payment received for unused vacation and sick leave. This action was brought to determine that the payment received for unused vacation and sick leave should be included in the final average monthly salary.

Both parties filed motions for summary judgment. The trial court found that the payment for unused vacation and sick leave should not be included in the final average monthly salary. The defendants' motion for summary judgment was sustained and the petition dismissed. The plaintiffs have appealed.

The facts are not in dispute. The Nebraska State Patrolmen's Retirement System was created in 1947. Section 60-452.01 provides: "Any patrolman qualified for an annuity . . . shall be entitled to receive a monthly annuity for the remainder of his life. The amount of the annuity shall be a percentage of his final average monthly salary. . . . For purposes of this computation, final average monthly salary is defined to be the sum of the patrolman's total salary

during his final three years of service as a patrolman divided by thirty-six." Upon retirement patrolmen are entitled to be paid in a lump sum for one-fourth of their accumulated unused sick leave and for all of their accumulated unused vacation leave. Neb. Rev. Stat. §§ 81-1325, 81-1328 (Reissue 1976).

The computation of patrolmen's retirement annuities on the basis of a percentage of final average monthly salary began in 1969. From that time until January 4, 1979, the lump sum payments for unused vacation and sick leave were included in the computation of "final average monthly salary." After January 4, 1979, the defendant Public Employees Retirement Board, on the basis of an Attorney General's opinion dated December 26, 1978, excluded these lump sum payments from the computation of retiring patrolmen's "final average monthly salary."

At the hearing on the motions for summary judgment, the plaintiffs introduced depositions and affidavits from patrolman-members of the system, which showed that the patrolmen had been advised repeatedly that such lump sum payments would be included in computing their final average monthly salary, and that such advice had constituted a specific incentive for them to join and remain with the State Patrol. There was also testimony that inclusion of the payments in pension computation was seen as a way to discourage abuse of the sick leave policy. In addition, some officers testified that, although they were eligible to retire before the policy change, since they did not retire until after the change, their annuity was lower than they had expected since it was computed without inclusion of the lump sum payments.

The record indicates that the question of inclusion of the lump sum payments was brought to the attention of the defendant Public Employees Retirement Board in 1972 by a letter from Colonel Kruger indi-

cating that such payments were included when computing a retiring patrolman's final average monthly salary. The minutes of the board meeting of May 22, 1972, stated: "Member Morehouse suggested that the computations based on final monthly salary, which includes sick and vacation time for retiring Safety Patrol members, be continued as in the past." By deposition, the director of the board testified that "back in May of 1972 it was determined that the Board had ruled that accrued sick leave and vacation leave could be included in the salary."

In 1978 a report by the Auditor of Public Accounts raised the issue of inclusion of the lump sum payments in computing final average monthly salary and recommended "that the Public Employees Retirement Board review this procedure to determine its equality. We further recommend that clarification be obtained for the calculation of benefits." The board requested an opinion from the Department of Justice on the matter. An Attorney General's opinion of December 26, 1978, recommended that the board cease to include the lump sum payments in pension calculations. Beginning January 4, 1979, the board followed this recommendation with regard to retiring patrolmen.

The District Court's order granting defendants' motion for summary judgment stated: "The court . . . finds that the administrative policy [of including the lump sum payments in the final salary calculation] did not create contractual rights in those patrolmen who served while that policy was in effect." The court relied on *Lickert v. City of Omaha,* 144 Neb. 75, 12 N.W.2d 644 (1944), which held: "The existence of legislation making pension and retirement provisions for members of a police department and the acceptance or retention of employment as a member of a police department does not establish a contract, between the member and the city, that such members will thereafter be granted the retire-

ment and pension benefits provided in such legislation." *Id.* at 84, 12 N.W.2d at 648-49. The plaintiffs contend that this finding was in error, and that the trial court erred in failing to find that the lump sum payments should be included in calculating patrolmen's retirement benefits.

"Upon a motion for summary judgment the judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Manzer v. Pentico,* 209 Neb. 364, 366, 307 N.W.2d 812, 813 (1981).

The issues in dispute in the trial court were purely legal issues: (1) Whether the lump sum payments should be included in the computation of a patrolman's final average monthly salary; and (2) Whether the board's 10-year practice of including the payments created an expectation in the patrolmen protected by the law of contracts. The matter was a proper one for decision upon a motion for summary judgment.

This case involves only the rights of patrolmen who were members of the Nebraska State Patrolmen's Retirement System on or before January 4, 1979. We do not consider or determine whether § 60-452.01 requires inclusion of the leave payments in calculating retirement annuities for patrolmen who became members of the system after that date.

The question before the court is whether the board's determination to exclude leave payments from pension calculations after January 4, 1979, constitutes an impairment of contractual rights of retiring members, in violation of the Constitution. "Where . . . it is claimed that the contract clause prohibits a state's statutory modification of its own obligations, the court must determine whether contractual obligations within the purview of the con-

tract clause exist; if so, whether the state legislation under attack impaired those obligations; and if there is an impairment of contract, whether it is forbidden by the Constitution." *Pineman v. Oechslin,* 494 F. Supp. 525, 538 (D. Conn. 1980).

At the time *Lickert v. City of Omaha, supra,* was decided, it was generally held that public employees' pensions were not a matter of contract but a gratuity " 'springing from the appreciation and graciousness of the sovereign.' " *Bedford v. White,* 106 Colo. 439, 444, 106 P.2d 469, 471 (1940). However, Nebraska has long recognized that such pensions are not gratuities. In *Gossman v. State Employees Retirement System,* 177 Neb. 326, 331-32, 129 N.W.2d 97, 101-02 (1964), this court said: " 'The benefit of the retirement system awarded to a member thereof *who renders services under the act creating the system* after its enactment is not a grant of extra compensation after the services are rendered which the Constitution condemns because the increase in pay is granted immediately and from the date of the grant is being currently earned. . . . *It is the payment thereof alone which is deferred to a later date.'* . . . The benefits conferred are deferred compensation payable to the employee under the terms and conditions of the Act which he voluntarily agrees to by accepting the terms of employment." In *Wilson v. Marsh,* 162 Neb. 237, 75 N.W.2d 723 (1956), in holding that pension benefits are deferred compensation and not a gratuity, we cited *State v. Love,* 89 Neb. 149, 131 N.W. 196 (1911), to the effect that " 'the pension forms an inducement to the individual to enter and remain in the service of the [state], and . . . the pension in a sense is part of the compensation paid for those services.' " *Id.* at 253, 75 N.W.2d at 733. The decisions in other states are now generally in agreement that pension payments constitute deferred compensation for services rendered. *Brazelton v. Kansas Public Employees Retirement Sys-*

*tem,* 227 Kan. 443, 607 P.2d 510 (1980); *Kleinfeldt v. New York City Emp. Ret. Sys.,* 73 Misc. 2d 310, 341 N.Y.S.2d 784 (1973); *Miller v. State of California,* 18 Cal. 3d 808, 557 P.2d 970, 135 Cal. Rptr. 386 (1977); *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320 (1973); *Pineman v. Oechslin, supra.*

Viewing public employee pensions as deferred compensation, earned in exchange for services rendered, caused courts to simultaneously recognize that this created in the employees reasonable expectations entitled to legal protection. "For the civil service employees, the price of the pension plan, whether specifically discussed or not, is part of the total wage package negotiated when salary raises are determined. Pensions are bargained as an integral part of the wage-and-fringe benefit calculus." *Kleinfeldt v. New York City Emp. Ret. Sys., supra* at 788-89. "[A]n employee who relies upon an offer of deferred benefits to his or her detriment, and to the benefit of the employer who gains the employee's valuable services and loyalty as a consequence thereof, has expectations which are protected by the law of contracts." *Pineman v. Oechslin, supra* at 540. " 'State retirement systems create contracts between the state and its employees who are members of the system.' This is the rule followed in most recent cases on the subject, and seems to us the more enlightened view." *Singer v. City of Topeka,* 227 Kan. 356, 363, 607 P.2d 467, 473 (1980). Since Nebraska law recognizes that public pensions are deferred compensation, *Gossman v. State Employees Retirement System, supra,* it follows that Nebraska public employees, no less than those in other states, have "reasonable expectations which are protected by the law of contracts" with regard to their pension rights. *Pineman v. Oechslin, supra.* To the extent that *Lickert v. City of Omaha,* 144 Neb. 75, 12 N.W.2d 644 (1944), is in conflict, it is overruled.

Since the plaintiffs' pension rights are contractual in nature, it must next be determined whether state action has impaired those obligations, and, if so, whether the impairment is forbidden by the Constitution. " '[I]t is not every modification of a contractual promise that impairs the obligation of contract under the federal law.' . . . [T]he State 'has the "sovereign right . . . to protect the . . . general welfare of the people" ' and ' "we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary . . . .' " ' " *United States Trust Co. v. New Jersey,* 431 U.S. 1, 16, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977).

In the present case, state patrolmen had been advised from 1969 until 1979 that their "final average monthly salary" would be computed by including the lump sum leave payments they would receive at retirement. There was much undisputed testimony that plaintiffs relied upon this advice and that it constituted an incentive to many of them to enter and remain in the service of the State Patrol. In 1979 inclusion of these payments in the annuity calculation ceased, without an offsetting increase in benefits. A similar situation occurred in *County Officials v. Retirement Board,* 89 Wash. 2d 729, 575 P.2d 230 (1978). There the court held: "For 25 years, [defendant] has consistently included termination payments in the computation of 'average final compensation.' During this period numerous expectations based upon this practice have arisen in the minds of current employee-members of the system. To now hold termination payments not includable would violate those expectations and be contrary to the position of this court first expressed in *Bakenhus v. Seattle,* 48 Wn. 2d 695, 700, 296 P.2d 536 (1956), where we stated 'The promise on which the employee relies is that which is made at the time he enters employment; and the obligation of the employer is based upon this promise.' " *Id.* at 733, 575 P.2d at

232. In *Miller v. State of California,* 18 Cal. 3d 808, 815, 557 P.2d 970, 974, 135 Cal. Rptr. 386, 390 (1977), the court held: "[T]he right to pension benefits vests upon the acceptance of employment . . . ." *Kranker v. Levitt,* 30 N.Y.2d 574, 281 N.E.2d 840, 841, 330 N.Y.S.2d 791, 792 (1972), states: "The 1957 decision of the Comptroller . . . to include cash payments for accumulated vacation credits in determining the salary base for the computation of retirement benefits constitutes a valid contract between the State Employees' Retirement System and its members. . . . Accordingly, the plaintiff and all others similarly situated have acquired a vested right to the aforesaid benefit, and that benefit may not now be constitutionally impaired."

Two previous Nebraska cases held that pension rights for public employees did not vest until "the particular event happens upon which the pension is to be paid . . . ." *Lickert v. City of Omaha, supra* at 84, 12 N.W.2d at 649; *Mollner v. City of Omaha,* 169 Neb. 44, 98 N.W.2d 33 (1959). In *Mollner* a provision of the city charter specifically stated that employees' contributions to the pension plan " 'shall not give rise to any vested rights on the part of such members by reason of said contribution, unless and until said member has completed all the requirements for a pension herein provided.' " *Id.* at 64, 98 N.W.2d at 44. The *Mollner* opinion then noted: "The present charter is consistent with the former one . . ." adopted in 1922. *Id.* at 64, 98 N.W.2d at 44. Although not quoted in *Lickert,* the "former charter," with which the new charter in *Mollner* was "consistent," was the charter in effect at the time *Lickert* was decided. The no-vesting holdings in *Mollner* and *Lickert* were based on specific charter provisions which prevented vesting of pension rights until retirement. Because Neb. Rev. Stat. §§ 60-441 et seq. (Reissue 1978) contain no provision preventing vesting until a certain time, the decisions in

*Mollner* and *Lickert* are not applicable. We find that the board's practice of including lump sum leave payments in the annuity calculation gave rise to legitimate expectations on the part of the plaintiffs and the plaintiffs have a vested right to have this practice continued as to them. The board's failure to include such payments after January 4, 1979, in calculating retirement annuities for patrolmen who were members of the system on or before January 4, 1979, was an impairment of vested contractual rights.

However, as noted in *Pineman v. Oechslin,* 494 F. Supp. 525, 548 (D. Conn. 1980), this impairment is not necessarily unconstitutional. "[The 1975 Act] may yet pass constitutional muster if it is *'both reasonable and necessary'* to 'serve an important public purpose.' *United States Trust Co. v. New Jersey,* 431 U.S. at 29 . . . (emphasis added). However, as Justice Blackmun has noted, the application of the tests of necessity and reasonableness requires a much greater degree of judicial scrutiny in cases, such as this one, involving [state action] which purports to abrogate a state's own financial obligation than in cases involving an impairment by the state of purely private contracts." *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467 (1980), states the rule in this manner: " 'To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.' " *Id.* at 366, 607 P.2d at 475.

The courts agree that meeting the "important public purpose" test is no easy task. In *Miles v. Tenn. Consol. Retirement System,* 548 S.W.2d 299, 305 (Tenn. 1977), the court stated: "The record contains testimony from the Actuary and other em-

ployees of the State that the 1975 Act was passed to alleviate the funding problems of the pension system in general, as well as the pension system for judges; but, nowhere in the record is there any claim from any witness that the attempt to alleviate this funding problem by the Act of 1975 was to protect *a vital interest of the State." Pineman v. Oechslin, supra* at 552, found the impairment unconstitutional because "the General Assembly which passed [this] legislation . . . was not forced to choose between abrogating its contractual commitments or permitting the state to become insolvent . . . ." *Opinion of the Justices,* 364 Mass. 847, 864, 303 N.E.2d 320, 329-30 (1973), notes: "That the maintenance of a retirement plan is heavily burdening a governmental unit has not itself been permitted to serve as justification for a scaling down of benefits figuring in the 'contract,' . . . ."

In the present case there is no evidence from which it could be found that an "important public purpose" or a "vital state interest" demanded the sudden exclusion of the leave payments from pension calculations. The Attorney General's opinion which recommended exclusion noted only that inclusion of the lump sum payments resulted in some patrolmen receiving larger annuities than others. There is no evidence that the continued financial integrity of the system depended upon exclusion of these payments or that the defendants were "forced to choose between abrogating [their] contractual commitments or permitting the state to become insolvent." *Pineman v. Oechslin, supra.* On the other hand, plaintiffs' evidence showed without dispute that the change would result in disadvantages to them without "comparable new advantages." *Singer v. City of Topeka, supra.* We find that the defendants' change in calculating plaintiffs' pension annuities resulted in an unconstitutional impairment of plaintiffs' contractual rights, and that the plain-

tiffs were entitled to summary judgment.

Since the final average monthly salary is calculated upon the total salary paid during the final 3 years of service, payment received for unused vacation and sick leave accumulated during the final 3 years of service only should be included in the calculation.

The judgment of the District Court is reversed and the cause remanded with directions to enter a judgment in conformity with this opinion.

REVERSED AND REMANDED
WITH DIRECTIONS.