Hickey, Appellant, *v.* Pittsburgh Pension Board.

Argued May 26, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*Albert E. Kabet,* with him *Nicholas R. Stone,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 28, 1954:
On May 10, 1910, Thomas W. Hickey, being then less than 28 years of age, entered the employment of the City of Pittsburgh. Five years later the Legisla-

ture of Pennsylvania enacted a law, Section 3 of which reads: "Every person now or hereafter employed by the said cities, as herein provided, if any, of the age of sixty years and upwards, who shall have been so employed for a period of twenty years or more, shall, upon application to the board of pensions herein created, be retired from service, and shall during the remainder of his or her life receive the pension or compensation fixed by this act . . ." (Sec. 3, Act of Assembly, May 28, 1915, P. L. 596).

The establishment of this pension undoubtedly offered a substantial inducement to Thomas Hickey to remain in government service. He was then only 33 years of age. Employment in private industry could have brought him a higher rate of pay with even possibly better opportunities for promotion, but against those attractions government service offered a more certain tenure and, with this pension law, an assured annuity in the future. Hickey could even build upon the prospect of obtaining, when he had reached his sixtieth year, another job, compensation from which, added to the guaranteed pension, would make for a comfortable living in his later years. With this long-ranged plan of his life ahead of him he agreed to remain 20 years with the City and pay certain sums into the Pension Fund.

In 1930 Hickey completed his twentieth year in the employment of the City and thus, under the Act of 1915, was qualified to receive his pension when he reached the three-score milestone of his life. Contractually, financially and morally Hickey had met all requirements for the pension and its fulfillment was delayed for reasons of chronology alone.

On April 26, 1933 (three years after Hickey had met the minimum tenure requirement in the City service,) the Legislature amended the Act of 1915, as fol-

lows: "If a pensioner of the cities of the second class shall or may hereafter be employed by the government of the United States, or the Commonwealth of Pennsylvania, or the same county in which such cities are, or by any subdivision of such counties, then such pension board of said cities of the second class shall have, and is hereby given, the authority to suspend the pension payments to such pensioner during the period of such employment." (Sec. 14, Act of Assembly, April 26, 1933, P. L. 81, amending Act of May 28, 1915, P. L. 596).

On January 1, 1947, Thomas Hickey, having now passed his sixtieth birthday, retired from the City, and the City, in accordance with the Act of 1915, initiated pension payments to him in the sum of $126.36 per month. But when, on February 1, 1952, Hickey obtained employment with the County of Allegheny, the City Pension Board discontinued payments to him under the supposed authority of the above-mentioned Act of 1933.

Hickey filed a Complaint in Mandamus to compel the defendant Pension Board to pay him the pension installments regardless of other employment. The court below dismissed the Complaint and the plaintiff appealed.

A similar question to the one raised in this case came before us in *Baker v. Retirement Board of Allegheny County*, 374 Pa. 165, where the defendant Allegheny County Retirement Board maintained that Baker who had been an employe of the City of Pittsburgh and was receiving a pension from the City and who after retirement from the City became a County employee, was not entitled to a pension from the County of Allegheny because of the Act of 1937, P. L. 191, (16 PS 326) prohibiting such double pensions. We ruled that the Act of 1937 which was passed after

Baker became a County employe, could not affect his already vested right to the County Pension: "When the legislation in question was passed, [The Act of 1937,] appellee already had been a member of, and had contributed to, the County retirement fund for approximately nine years. He made these contributions on the basis of the existing rules, regulations and provisions for eligibility for retirement allowance. As of the time he joined the fund, his right to continued membership therein, under the same rules and regulations existing at the time of his employment, was complete and vested. The legislature could not thereafter constitutionally alter the provisions of his already existing contract of membership."

When the Act of 1933 involved in the case at bar was passed, Thomas Hickey had completed 23 years of service as an employee of the City of Pittsburgh and had made contributions into the pension fund for more than 17 years. His pension was as assured (upon his attaining 60 years of age) as if the Pension Board had already placed the pension installments in a safety deposit box and had given him the key to the lock which would open to that key each month, once the intervening time limitation had expired. This right became private property belonging to Hickey, and the Legislature could not under any circumstances demand from Hickey surrender of the key to the deposit vault.

Much of the misapprehension which apparently still exists in the minds of conscientious administrators of pension funds is possibly due to the fact that there still lingers a remnant of the ancient idea that a pension is a manifestation of sovereign generosity. The concept of pensions has come down through the centuries wearing a cloak of monarchical dispensation. Kings conferred pensions on court favorites, artists and military heroes with a flourish which proclaimed

that the royal treasury was as inexhaustible as the crown's power was unlimited. However, despite ceremony and pronunciamento, the pensioner obtained no vested right to the proclaimed pension. In fact, he could not be any more assured of a continuation of the pension than he could be assured that his head would remain on his shoulders if he should displease his absolutist benefactor. But the pension of today is not a grant of the Republic nor in this case is it a gift of the City Fathers. It is the product of mutual promises between the pensioning authority and the pensioner; it is the result of contributions into a fund which exists for the single purpose of pensions. Adhering to the theory that pensioners are in the nature of glorified petitioners for public largesse, the appellees call to our attention general statements in the law books which undoubtedly originated in the era of imperial and kingly sway. For instance, counsel for the appellees quote: "The unquestioned rule is that a pension granted by the public authorities is not a contractual obligation, but a gratuitous allowance, in the continuance of which the pensioner has no vested right; and that a pension is accordingly terminable at the will of the grantor." (54 A.L.R. Ann. 943)

Also: "the weight of authority seems to be that the mere fact that a beneficiary has been compelled to contribute a part of his compensation to the support of a pension plan will not ordinarily give him vested rights." 137 A.L.R. Ann. 252, *Miller v. Price,* 282 Ky. 611, 139 S.W. 2d.

But only last year our Superior Court said, in the case of *Hamilton v. Wilson,* 172 Pa. Superior Ct. 437, 443: "The basic theory which supports retirement statutes is that retirement pay is adjusted or delayed compensation for service rendered in the past."

As far back as 1925, this Court declared in specific language that a pension or retirement fund is not a

matter of charity or benevolence: "With relation to the retirement acts, . . . the basis on which these acts are founded is neither charitable nor benevolent; they are founded on faithful, valuable services actually rendered to the Commonwealth over a long period of years, . . ." (*Busser v. Snyder,* 282 Pa. 440, 454.)

In 1934 we said in the case of *Retirement Board v. McGovern,* 316 Pa. 161, 177: "The legislature, in effect, makes this offer to the employee: The state or municipality will contribute so much money to a fund and you will contribute to the same fund for a given time on the basis of service performed. . . . It is difficult to understand where this relation lacks the elements of an executor contract if the employee and the state have directly or indirectly made any payments on account of it."

Further, "Retirement pay is defined as 'adjusted compensation' presently earned, which with contributions from employees, is payable in the future."

In 1939 we said in the case of *McBride v. Allegheny County Retirement Board,* 330 Pa. 402: "Our Act establishing the county employees' retirement system, and also the acts providing for retirement of State employees, employees of cities of the first class, teachers, and motor police, recognize the employee as being a party to the contract."

If Hickey is party to a contract the Legislature may not impair that contract. Hickey agreed to work for the City 20 years and to pay certain sums into the Pension Fund. He has fulfilled those conditions. The City agreed, in its turn, to pay Hickey a pension or *compensation* for the remainder of his life when he reached his 60th year. Shutting off the pension because he obtained employment elsewhere is refusal on the part of the Pension Fund to abide by its contract. If this contract had been entered into between a private

individual and a private corporation it is unquestioned that the Legislature could not impose an additional condition for its fulfillment. The law does not change because one of the parties is a governmental agency.

The appellees in this case entertain the fallacious idea (shared by many others) that a contract of employment between government and employee is paternalistic; that there is something almost philanthropic about the government paying salaries to its employees. Thus, counsel for the Pension Board say: "A person who receives public money every month under a municipal retirement system should not receive additional public monies as an active employee of the county in which the city of which he is a pensioner is situated." But a contractor who constructs a public office building in one city and a public swimming pool in another city also receives public monies from two governmental agencies, but this fact does not lessen the legality or right of his claim. He is rendering two services. Appellee's counsel further argue: "It is quite clear that the same tax payers who maintain the retirement pay would also pay the salary of subsequent employment of the pensioner. That this is not consistent with public policy and the spirit of pension systems is also quite evident."

What difference does it make to the taxpayers whether the county salary is paid to Thomas W. Hickey or Thomas W. Smith? The service is required and the salary is paid regardless of identity of the payee. It is a mere coincidence that the man who is receiving a city pension after 36 years faithful City service and the man who works for the County, again giving faithful, competent service happens to be the same man. He is like the contractor who built the office building and the swimming pool. He is entitled to remuneration for both jobs.

The interdiction in the Act of 1933 is not so much a suspension of pension rights as it is a restriction on the right of employment. The Act says in effect that Hickey will receive what he is entitled to receive and what he has paid for, provided he does not work for Allegheny County. But the Legislature has no right to say this. It can no more bar Hickey from working for the County than it can bar him from working for the United States Steel Company, or from running a grocery store, or from taking a trip to Europe, or running for political office.

Nor is there any indication anywhere that the Legislature intended to hamstring Thomas Hickey in this fashion. The history of retirement and pension legislation shows that the General Assembly of Pennsylvania has displayed an ever-augmenting appreciation of problems which confront long-term public employes, and has made provision for unusual situations so that no government employe will be deprived of what he has the right to expect: economic recognition in the evening of his life when he has given with full will of his energies in the morning and afternoon.

In this spirit of recognition and appreciation for long, effective and efficient services in the past, our Legislature has provided the means whereby an employee who has been stalled at the next-to-the-top rung of the ladder of pension rights may be pulled to the top. For instance,

(1) The employe who has been dismissed after 20 years of service but has not yet attained 60 years of age, may continue making payments to the fund so as to receive his pension at 60.[1]

(2) The employe who has been disabled after 20 years of service but has not reached 60 may receive the

---

[1] Section 7, Act of 1915.

pension upon proof of total and permanent disability.[2]

(3) Employes who have been separated from City service after 18 years of service may upon serving 2 years further at any time in the future enter into pension rights.[3]

(4) Employes who have been employed by the City for 25 years and then are dismissed may receive their pension when they reach the age of 50.[4]

(5) Employes who have been dismissed for reasons other than misconduct, after serving for 15 years or more but less than 20, may receive appropriate pensions.[5]

In the *McGovern* case, *supra,* this Court said: "The legislature may from time to time, within the confines of that established relation, alter, change, amend, and render intact the actuarial soundness of the system so as to strengthen its fibers in any way it sees fit." (p. 176)

The Legislature may strengthen the actuarial fibers but it cannot break the bonds of contractual obligations. The permissible changes, amendments and alterations provided for by the Legislature can apply only to conditions in the future, and never to the past. According to the cardinal principle of justice and fair dealings between government and man, as well as between man and man, the parties shall know prior to entering into a business relationship the conditions which shall govern that relationship. Ex post facto legislation is abhorred in criminal law because it stigmatizes with criminality an act entirely innocent when committed. The impairment of contractual obligations

---

[2] Section 4, Ibid.
[3] Act of 1925, P. L. 742, Sec. 3.
[4] Act of 1939, P. L. 163.
[5] Act of 1947, P. L. 524.

by the Legislature is equally abhorrent because such impairment changes the blueprint of a bridge construction when the spans are half way across the stream.

All persons who entered City employment after 1933 were put on notice that, if, after reaching the age of 60 following 20 years of service, they obtained other government employment they would have to sacrifice their city pension. But when Thomas Hickey started contributing to the city pension fund in 1915, there appeared on the horizon not the slightest suggestion of a cloud to imperil the pension toward which he was faithfully to plod for 31 years. It is not reasonable or logical to suppose that, given the liberal attitude that the General Assembly has assumed in this field of legislation, that it would impose restrictions so fundamentally contrary not only to its policy but to the elemental rules of fairness. Whether it be in the field of sports or in halls of the legislature it is not consonant with American traditions of fairness and justice to change the ground rules in the middle of the game.

Thomas Hickey is entitled to be paid according to the contract of 1915. If the position of the appellee Fund were to be accepted, the following startling anomaly would occur: one who enters the City service and contributes to the Fund for less than 20 years is entitled, if he so desires, to obtain back all the money that he contributed to the Fund. But if one pays for the whole 20 years (in this case 31 years) and even takes a government position, he loses not only the pension but his contribution for 31 years! So grotesque a result was obviously never intended by the Legislature. Under this interpretation, even the widow of the potential pensioner would not be entitled to claim a refund of her husband's contributions since she would

not qualify as the widow of "any person receiving a pension under this Act."[*]

We hold, therefore, that Hickey's rights to a city pension became vested on May 10, 1930, when he completed 20 years' service with the City and had made all pension contributions required under the Act of 1915; that this vested right was personal property held by the Pension Fund in the name of the petitioner until the latter should have attained to the age of 60 years; and that the Legislature after May 10, 1930, could in no way diminish Hickey's rights to the pension duly paid for in services and money as much as if it were an annuity in a private insurance company. The plaintiff is also entitled to such amounts as may be due him by the amending Acts of 1951, P. L. 1091 and 1952, P. L. 2110, with regard to cost of living increases, as claimed in Paragraph 9 of his Complaint.

Order reversed, complaint reinstated, and the cause remanded to the court below for such action as is required in accordance with the provisions of this Opinion. Costs on the appellee.

Mr. Justice JONES and Mr. Justice CHIDSEY concur in the result.

---

[*] Par. C, Sec. 1, 1947 Amendment.