DANIEL F. DULLEA vs. MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY.

Norfolk. April 8, 1981. — June 15, 1981.

Present: HALE, C.J., GRANT, & GREANEY, JJ.

*Retirement. Contract,* Retirement. *Public Employment,* Retirement.
*Massachusetts Bay Transportation Authority,* Retirement, General
manager.

A vote by the board of directors of the Massachusetts Bay Transportation
   Authority which authorized the general manager to execute certain
   deferred compensation agreements with employees on the executive
   payroll and which had a postscript giving the then general manager's
   successor the opportunity to review the back-up papers relative to the
   vote was not interpreted as conditioning the manager's power to ex-
   ecute binding agreements on the successor's prior approval of the plan
   where the manager's immediate execution of 137 of the agreements
   and the signing of the manager's own agreement by three of the direc-
   tors, the board's actions at subsequent meetings adopting the vote and
   making it public, and the board's later formal retraction of the vote all
   indicated that the vote was to take effect immediately without the suc-
   cessor's prior approval. [87-88]
Review of principles applied in determining the effect of modifications in
   governmental pension plans. [88-95]
An employee who executed an agreement with the Massachusetts Bay
   Transportation Authority in accordance with a vote by the authority's
   board of directors to implement a system of increased retirement bene-
   fits for certain employees had not acquired a sufficient interest in the
   plan to prohibit the board's retraction of it thirty-seven days after its
   approval where the employee had taken no action in reliance on the
   plan nor performed any substantial services for a significant period
   based on the agreement; where the authority's rescission of its approval
   did not reduce the employee's retirement benefits below the level in ef-
   fect at the time of his hiring or during the bulk of his service; and where
   the authority had sound reasons for retracting the plan. [95-96]

CIVIL ACTION commenced in the Superior Court on
June 8, 1978.

The case was heard by *Garrity, J.*

*John M. Stevens* for the defendant.

*M. Robert Dushman* (*Marilyn D. Stempler* with him) for the plaintiff.

GREANEY, J.  This case concerns the effect of certain votes by the Massachusetts Bay Transportation Authority's board of directors in May and June, 1975, which first approved and then sought to vacate a deferred compensation plan which increased certain benefits payable on retirement for 138 employees on the Authority's executive payroll.  Prior to the vote which is claimed to have effected rescission, agreements were signed with each of the benefited employees.  Dullea, the recipient of one such agreement, brought suit in the Superior Court for its specific enforcement.  The Authority replied with several defenses, only two of which remain alive on this appeal:  (1) whether its board of directors had in fact empowered the general manager to execute final and binding agreements with the eligible employees, and, if so, (2) whether the board could properly vacate the vote establishing the plan.  At the heart of the dispute is the question whether the plaintiff's agreement embodied a true contractual undertaking to defer payments of salary, or whether it represented a payment of pension benefits which is subject to a different analysis.  A judge of the Superior Court ruled[1] that the agreement is "subject to a straightforward contractual analysis and not the more complex treatment afforded pension benefits," and he directed the entry of a judgment specifically enforcing its terms.  The judgment was stayed pending disposition of the Authority's appeal.  We reverse.

The statement of agreed facts and exhibits furnish these details.  Dullea was employed by the Authority and its predecessor, the Metropolitan Transit Authority, from November 1, 1940, until he retired on March 1, 1976, serving during the last five years on its executive payroll as assistant

---

[1] The case was considered below on a statement of agreed facts and exhibits.

treasurer-controller. Employees retiring from the Authority's executive payroll receive two types of payments. First, they are paid benefits under the contributory retirement fund (about which there is no controversy in this case). Second, the Authority has undertaken to pay them additional noncontributory benefits pursuant to a vote of the old Transit Authority's board of trustees approved on March 23, 1964. Under that vote, each eligible employee who thereafter retired from the executive payroll was to receive supplemental benefits equal to one percent of his average annual compensation multiplied by his number of years of service. These payments, however, are limited by a provision which restricts the annual combined (i.e. contributory and noncontributory) benefits to a maximum of sixty-five percent of the employee's average annual compensation. This arrangement remained in effect from 1964 through early 1975.

On March 26, 1975, the Authority's directors adopted a vote which purported to establish a separate pension and retirement system for executive employees and which authorized the general manager "to implement the [e]xecutive [p]ension [s]ystem established by this [v]ote." It appears that the contemplated system never came into existence. Instead, in May, 1975, a proposal was submitted to amend the deferred compensation portion of the combined pension benefits. That proposal recommended an increase in noncontributory benefits by: (1) changing the average annual compensation used to compute deferred compensation to an eligible employee's five highest paid, rather than his last five years of service; (2) permitting the employee to receive two, rather than one, percent of his average annual compensation for each year of service; and (3) raising the ceiling on maximum combined pension benefits from sixty-five to eighty percent of the employee's applicable average compensation. The question whether this plan should be implemented was placed before the directors (meeting in executive session) on May 14, 1975, in the form of a proposed vote which read as follows:

"[T]hat the [b]oard of [d]irectors hereby authorizes
. . . the [g]eneral [m]anager to execute on behalf of the
Authority [d]eferred [c]ompensation [a]greements
with all persons on the [e]xecutive [p]ayroll of the
Authority, such [a]greements to be substantially in the
form presented to this [m]eeting and filed with the rec-
ords thereof with such modifications in form as may be
approved by the [g]eneral [c]ounsel; and that as addi-
tional persons shall be added to said [e]xecutive [p]ay-
roll similar contracts shall be executed as in the form
above; said [d]eferred [c]ompensation [a]greements to
be in lieu of, and not in addition to, any presently ex-
isting [d]eferred [c]ompensation [a]greement which
may have been executed between the MBTA and the
individual involved."

The board passed the vote with the addition of a sentence
(as appearing in the formal minutes of the meeting) that
"[t]he back-up papers relative to the immediately preceding
[v]ote are to be forwarded to Mr. Robert R. Kiley, Deputy
Mayor, for his review."[2] The next day, counterparts of the
deferred compensation agreement that had been approved
at the meeting were signed with 138 employees, including
the plaintiff.[3]

---

[2] The recording secretary's handwritten record of the board's addition
to the vote read: "[A]lthough it was voted, R. R. Kiley is to be given op-
portunity to review it."

[3] All the counterparts were signed by the Authority's general manager,
Joseph Kelly, and were approved as to form by the general counsel, with
two exceptions. Since Kelly was one of the eligible employees on the ex-
ecutive payroll, the counterpart which he signed as an employee and also
as general manager was signed by three members of the Authority's board
of directors. The general counsel also signed a counterpart as an
employee, and another attorney in the legal department approved that
counterpart as to form.

It is estimated that if all 138 employees are to receive benefits calculat-
ed in keeping with the terms of the documents, the resulting projected in-
crease in retirement benefits payable by the Authority during the next
twenty-eight years would be $8,440,751. The present discounted value of
those payments is estimated at $4,258,264.

We now outline Kiley's role in the matter and the events which followed the May 14 vote. In May, 1975, the Authority was in the midst of transition. By May 14, Kiley had been appointed by the Governor and approved by the Authority's advisory board to succeed Kelly as general manager and to replace one Doolittle as chairman of the Authority's board of directors. Kiley formally assumed both positions on May 19, 1975, five days after the deferred compensation proposal was approved. It is obvious when the vote was passed and the 138 agreements signed that the directors were aware of the fact that Kiley would soon assume command. Some time after the meeting a copy of the vote and the so called back-up papers were forwarded to Kiley, via one of his assistants. Kiley, however, apparently failed to review the documents or become aware of the over-all significance of the board's action until on or about June 10, 1975. At a board meeting on June 11, 1975, over which Kiley presided, the directors authorized the release of the May 14 vote for general publication. The deferred compensation matter then resurfaced at the board's meeting on June 20, 1975. At that meeting, the directors (inferably acting on Kiley's recommendation) voted unanimously[4] to vacate the May 14 vote and to refer the general subject of executive pensions to the personnel department for further study.[5] The Authority thereafter publicly an-

---

[4] The three directors who had constituted the quorum that approved the May 14 vote were present and voting on June 20. They were joined in the rescission vote by two other directors who had not participated in the May 14 vote.

[5] A preamble to the rescission vote stated that establishment of a separate executive pension system would involve protracted time and study, that an amendment of the deferred compensation program was considered as an initial step in establishing such a reorganized pension program, that funding of the new program would be subject to advisory board approval, and that it appeared that a complete program should be established before the matter was referred to the advisory board. There was concern voiced at the meeting by the press that the May 14 vote had been taken in executive session and concern by the chairman of the advisory board's budget committee that that committee had not been informed of the changes in the existing pension program.

nounced that it would not pay benefits under any of the documents signed on May 15. The parties have stipulated that there was no material change in the status of any employee on the Authority's executive payroll between May 14 and June 20, 1975, that no employee was hired onto or retired from that payroll during that period, and that Dullea's terms and conditions of employment were not otherwise altered in any respect between those dates. Of the total of 138 agreements, all were returned and cancelled except for those executed by the plaintiff and a handful of other employees.

1. The Authority claims that the May 14 vote did not empower Kelly to execute binding agreements because the last sentence thereof conditioned his authority upon Kiley's prior approval of the plan. Thus, the Authority contends, Kiley's later action calling for retraction of the vote amounted to the exercise of his absolute right to veto the entire proposal. We disagree.

The language of the May 14 vote explicitly "authorizes the . . . [g]eneral [m]anager to execute on behalf of the Authority [d]eferred [c]ompensation [a]greements with all persons on the [e]xecutive [p]ayroll . . . ." This statement conferred express authority on Kelly to implement the plan by signing agreements with all eligible employees. The postscript which gave Kiley the opportunity to "review" the back-up papers obscures the meaning of the foregoing statement, and the original handwritten version of the postscript (see note 2, *supra*) is of relatively little assistance in determining the directors' intended role for Kiley. However, we may infer that, since only the "back-up papers" were to be submitted to Kiley, the directors were referring to him questions of implementation rather than underlying policy. We think it more appropriate in settling the question of the respective authority of the two general managers to look to events following the May 14 vote as some indication of the practical meaning placed on the vote by the parties themselves. See Restatement (Second) of Agency § 42 & Comment a (1957). Cf. Leach & Liacos, Massachusetts Evi-

dence 278-280 (4th ed. 1967); *Pittsfield & No. Adams R.R.*
v. *Boston & Albany R.R.*, 260 Mass. 390, 397-398 (1927);
*Cooley* v. *Bettigole*, 1 Mass. App. Ct. 515, 521 (1973). Cer-
tainly, Kelly's signing of 137 counterparts of the deferred
compensation agreement and the signing of Kelly's agree-
ment by three of the directors is significant evidence that the
May 14 vote was to take effect immediately without Kiley's
prior approval. Significant also are the board's actions at
subsequent meetings which certified and adopted the
May 14 vote and made it public.[6] The votes at the later
meetings would be rendered largely nugatory if the May 14
vote were construed as conditional. Most telling, perhaps,
is the fact that after Kiley had taken the time to review the
plan, the directors voted to retract it. It seems unlikely that
the board would have gone to the bother of formally
vacating the May 14 vote if that vote had initially vested
Kiley with an unfettered power of veto. We think that the
last sentence of the vote was designed to give Kiley, in view
of his imminent succession to office, the chance to study the
merits of the plan and its ramifications on the Authority's
fiscal condition, to provide him with the opportunity to ex-
press his views to the directors on the proposal's suitability,
and to furnish him the right to make a recommendation as
to whether the May 14 vote should stand or be retracted.
This is the precise sequence of events which occurred.

2. Could the board then, thirty-seven days later, nullify
the action by which it had created the plan? The answer to
this question requires a threshold determination whether
the benefits embodied in the plaintiff's agreement are to be
analyzed under ordinary contract law principles or whether
they are better suited for the analysis reserved for modifica-
tions of publicly funded pension programs.

The characterization of the payments as deferred com-
pensation is of no more than peripheral interest because we

---

[6] The last such vote on June 11, 1975, expressly reiterated authority for
"the members of the [b]oard or the [g]eneral [m]anager to execute, on
behalf of the Authority, [d]eferred [c]ompensation [a]greements with all
persons on the [e]xecutive [p]ayroll of the [a]uthority."

must be concerned with their substance and not the label put on them by the parties. The plaintiff's agreement describes the contemplated payments forthrightly as a constituent part of his "combined pension benefits." The agreement's relevant provisions postpone payments until the employee's retirement, when they then may be made "in accordance with the . . . options [available under] the Authority's [r]etirement fund." Benefits are not assignable or alienable, terminate on the employee's death (unless any available survivor options are selected), and cease altogether "during any period that the [e]mployee is returned to service." The new plan remains part of the noncontributory benefits given to retiring employees and was developed as a means of upgrading existing benefits which had long been an element of the Authority's total executive retirement package. The benefits were intended to be part of an executive *pension* system. The plan differs from the State's statutory plan for deferred compensation (G. L. c. 29, § 64, as amended by St. 1976, c. 422, § 4), which enables certain public employees to postpone payment of a portion of their salaries which would otherwise be available immediately.[7] No undue strain is required to fit the payments contemplated by the May 14 vote into traditional legal definitions of a "pension". See *State ex rel. Bolen* v. *Seattle*, 61 Wash. 2d. 196, 198 (1963) (a pension is "deferred compensation for services rendered"); *Broadhurst* v. *Fall River*, 278 Mass. 167, 169 (1932) ("A pension is definite in amount, lasts during the life of the pensioner, and must be disbursed regularly out of the public treasury without any concurring service rendered by the pensioner for the public").

---

[7] This program was originally established in 1972 (St. 1972 c. 807, § 33). It permits investment of the employee's own income without supplementation by government funds. It provides that "[a]ny income deferred under such a plan shall continue to be included as regular compensation, as defined in [G. L. c. 32, § 1], for the purpose of computing the retirement and pension benefits earned by any employee, but any sum so deducted shall not be included in the computation of any taxes withheld on behalf of any such employee."

Moreover, it is undeniable that the Authority is classified as a political subdivision of the Commonwealth (G. L. c. 161A, § 2), and that its employees are public employees. *Hansen* v. *Commonwealth*, 344 Mass. 214, 218-219 (1962). *Massachusetts Bay Transp. Authy.* v. *Labor Relations Commn.*, 356 Mass. 563, 565 (1970). There are, of course, differences between the instant plan and the complex system provided by the Legislature in G. L. c. 32 for certain categories of public employees.[8] And it is true in a general sense that payments of this sort may be thought of as rewards for past performance or as incentives to retain employees in public service in the face of better prospects in the private sector. However, while these differences do exist, we do not consider them to be so fundamental as to compel disregard of helpful precedents regarding employee rights in public pensions. We conclude that the remaining issues are best resolved by a review and application of those still-evolving precedents, and to that task we next turn.

3. For many years, the courts used one or the other of two radically different theories to determine the effect of modifications of governmental pension plans. A numerical

---

[8] The plaintiff considers as significant that these benefits were offered only to a small number of the Authority's employees. He also states that the program was designed to remedy the erosion caused by inflation to the prevailing level of deferred compensation benefits, and to align the retirement benefits of executives on a percentage of salary basis with the higher benefits afforded to lower paid Authority employees. Thus, he claims that because the agreements were designed to remedy a specific inequity involving a limited number of executive employees, they lack the essential "across the board nature" of a Statewide statutory pension system. Nevertheless, the proposal did establish a plan which was general in nature and which was to apply indiscriminately to all employees within the class. Moreover, like the statutory scheme, it did not grow out of any negotiations between the authorizing agency and the supposed beneficiaries, and the prospective recipients did not participate in the plan's formulation. The benefits were granted unilaterally, just as they are by a statutory pension program. The principal element of consideration for the agreement was the rendition of future services. The facts that the plan was established by a semi-autonomous board of directors of a public authority and that superficial contract formalities were used to implement the program would not change the basic nature of the benefits.

majority of jurisdictions, including Massachusetts, treated benefits under these plans as mere gratuities which could be changed or revoked to the employee's detriment at any time — even if the promised benefits had been taken in part from an employee's own salary, and sometimes even if the employee had satisfied all the conditions required to qualify for his pension. See, e.g. (outside of Massachusetts), *Pennie* v. *Reis*, 132 U.S. 464 (1889); *Bergin* v. *Trustees of Teachers' Retirement Sys.*, 31 Ill. 2d 566, 574 (1964); *Patterson* v. *Baton Rouge*, 309 So.2d 306, 311-313 (La. 1975); *Mollner* v. *Omaha*, 169 Neb. 44, 59-65 (1959); *Dallas* v. *Trammell*, 129 Tex. 150 (1937); and (in this State) *Foley* v. *Springfield*, 328 Mass. 59 (1951); *Kinney* v. *Contributory Retirement Appeal Bd.*, 330 Mass. 302 (1953); *Smolinski* v. *Boston Retirement Bd.*, 346 Mass. 210 (1963). See also the discussion of the last three cases in *Opinion of the Justices*, 364 Mass. 847, 856-858 (1973). The remaining jurisdictions considered the promise of a pension, once accepted, as creating an irrevocable contractual commitment to pay the pension which was immune from any modification by the public employer which would effect a reduction in benefits. See, e.g., *Yeazell* v. *Copins*, 98 Ariz. 109 (1965); *Bender* v. *Anglin*, 207 Ga. 108, cert. denied, 340 U.S. 878 (1950); *Wright* v. *Allegheny County Retirement Bd.*, 390 Pa. 75, 79-80 (1957). As discussed in the margin, both the gratuity and the contract theories suffer from infirmities which undercut their utility in solving problems caused by today's complex public pension systems.[9]

---

[9] The chief defect of the gratuity hypothesis is that, in practice, it can be unjust. Public employees are likely to rely on promises of retirement benefits when initially accepting employment, when deciding whether to continue in government service, and when planning their future. They are exposed to severe hardship, if, after a long period of service, the promised pensions are reduced or retracted. See *Hickey* v. *Pittsburgh Pension Bd.*, 378 Pa. 300, 302 (1954); Note, Contractual Aspects Of Pension Plan Modification, 56 Colum. L. Rev. 251, 254 (1956); Note, Public Employee Pensions In Times of Fiscal Distress, 90 Harv. L. Rev. 992, 997 (1977). Contract analysis is cumbersome and suffers from at least two flaws. First, it distorts reality, because the establishment of a governmental

The need for a better formulation was discussed in the 1973 *Opinion of the Justices, supra.* That opinion dealt with proposed changes which would adversely affect the "contractual" rights (see G. L. c. 32, § 25[5], as appearing in St. 1956, c. 525) accorded employees of the Commonwealth and certain of its subdivisions by the contributory retirement system delineated in G. L. c. 32, §§ 1-28. In expressing the view that a portion of the proposed legislation which would increase the burdens on covered employees without conferring corresponding benefits was presumptively invalid, the Justices had this to say (364 Mass. at 861-862) about existing modes of analysis:

"The label 'gratuity' could never have been taken with sober literalness, and so also for 'contract.' It is not really feasible — nor would it be desirable — to fit so complex and dynamic a set of arrangements as a statutory retirement scheme into ordinary contract law which posits as its model a joining of the wills of mutually assenting individuals to form a specific bargain. As the commentators show, a retirement plan for public employees does not readily submit itself to analysis according to Professor Williston's canons. . . . When, therefore, the characterization 'contract' is used, it is best understood as meaning that the retirement scheme has generated material expectations on

---

pension plan bears at most only a general resemblance to negotiation and formation of a contract. These programs are almost always instituted unilaterally without prior consultation with prospective beneficiaries. The express consent of the employee, if it is required at all, is usually a formality, and there is no "bargained-for" consideration in the usual sense of that concept. The second infirmity in the contract analysis is that, by freezing the provisions of the plan without any adjustments, serious harm can occur to the governmental entity that created it. Changes in policies, commitments, and financial conditions can make plans drafted under favorable conditions unrealistic and burdensome on the government employer. See, e.g., *Talbott* v. *Independent Sch. Dist.,* 230 Iowa 949 (1941); *Newcomb* v. *Ogden City Pub. Sch. Teachers' Retirement Commn.,* 121 Utah 503 (1952).

the part of employees and those expectations should in substance be respected. Such is the content of 'contract.'

"It is true that a few cases that adopt the label of 'contract' have approached the terms of a retirement plan as they would a bond indenture, but closer to the realities is the view that 'contract' protects the member of a retirement plan in the core of his reasonable expectations, but not against subtractions which, although possibly exceeding the trivial, can claim certain practical justifications. Attention should then center on the nature of these justifications in the light of the problems of financing and administering these massive plans under changing conditions" (citations and footnotes omitted).

The thrust of this opinion, as we read it, is that reasonably based reliance by public employees on an express promise that their pensions are irrevocable[10] gives those employees a vested right[11] sufficient to bar a reduction of those benefits below the level existing when the employees first began work, or the level existing at the point when the promise had created expectations firm enough to command judicial respect. The opinion left open the question when the last

_____

[10] The express legislative promise referred to in the opinion is the one contained in G. L. c. 32, § 25(5), which makes membership in the retirement system established by §§ 1-28 of the same chapter "a contractual relationship under which members who are or may be retired for superannuation are entitled to contractual rights and benefits, and no amendments or alterations shall be made that will deprive any such member or any group of such members of their pension rights or benefits provided for thereunder . . . ."

[11] As a result of this vested right, a proposed increase in the contributory retirement system which would have raised salary deductions for members in the system from five to seven percent without any enlargement of benefits was considered presumptively invalid, but proper if applied prospectively to employees entering the system after January 1, 1974.

level would be reached, and courts faced with future problems were directed to analyze the rights of the parties on the given facts under the more realistic guidelines adopted by California.

The attitude in that State may be summarized as follows. First, the California decisions strongly suggest that an employee's rights to a pension will not vest until he has worked for a legally significant period of time in reliance on the belief that he will be protected by a pension. See *Kern* v. *Long Beach*, 29 Cal. 2d 848, 855 (1947) (the right arises "as soon as [the employee] has performed substantial services for his employer"). See also *Houghton* v. *Long Beach*, 164 Cal. App. 2d 298, 305 (1958); *Frank* v. *Board of Admn. of Pub. Employees' Retirement Sys.*, 56 Cal. App. 3d 236, 241 (1976). Second, despite the vesting of the employee's entitlement, the public employer retains some authority to make "reasonable" modifications in its pension program in order to meet "changing conditions" and to "maintain the integrity of the system," provided that "changes in a pension plan which result in disadvantage to employees [are] accompanied by comparable new advantages."[12] *Allen* v. *Long Beach*, 45 Cal. 2d 128, 131 (1955). *Miller* v. *California*, 18 Cal. 3d 808, 816 (1977). *Betts* v. *Board of Admn. of Pub. Employees' Retirement Sys.*, 21 Cal. 3d 859, 864 (1978). In the *Houghton* case, 164 Cal. App.2d at 306, for example, an increase in employee contributions without any compensating increase in benefits was upheld on a showing by the city that the additional revenues would result in improved financial stability for the system. These principles avoid rigid adherence to strictly formalistic doctrine by balancing the interests of the governmental employer in revising plans to ensure their soundness with

---

[12] The rule of qualified vesting has been adopted in Washington and Colorado. See *Leonard* v. *Seattle*, 81 Wash. 2d 479, 485-490 (1972), and *Police Pension & Relief Bd.* v. *Bills*, 148 Colo. 383 (1961). See also Cohn, Public Employee Retirement Plans — The Nature of the Employees' Rights, 1968 U. Ill. L.F. 32, 46-48 (1968).

the legitimate reliance interests of employees who look to pensions as a substantial benefit accruing from the satisfactory performance of long-term service. The essence renders the entitlements of both parties subject to reasonable limitations. The government, on the one hand, cannot make unilateral or capricious changes in pension programs which have been held out to employees "as in substance delayed compensation for their services, and [relied upon] . . . as a security against destitution in their old age and against catastrophe." *Opinion of the Justices,* 364 Mass. at 858. Conversely, an employee may not insist that his expectations be fulfilled unless they are premised on an adequate period of service and practically justified in the circumstances.[13]

On an application of these principles to this case, we conclude that the plaintiff had not acquired a sufficient interest in the plan to prohibit retraction of the plan. The Authority's approval of the enhanced benefits, although absolute in form, was somewhat tentative. It was certainly short-lived — only thirty-seven days after the board's vote the plan was decisively and publicly renounced. The plaintiff took no decisive action in reliance on the promise of more benefits, nor did he perform any substantial services for a significant period based on his agreement. Importantly, the Authority's action did not reduce this plaintiff's retirement benefits below the level in effect at the time of his hiring or below the level in force during the bulk of service. To the contrary, his benefits were maintained at the level they had reached almost thirty-five years after he began his employ-

---

[13] This position substantially adopts, in different words, the rule which has prevailed with respect to private pension disputes. See, e.g., *Balkin* v. *Katz,* 373 Mass. 419 (1977), holding that an employee's reliance on an oral promise to pay a pension by continuing his employment for six years after the promise was made constituted sufficient consideration to warrant a conclusion that a contract to pay a pension had been formed, and *Hoefel* v. *Atlas Tack Corp.,* 581 F.2d 1 (1st Cir. 1978), applying *Balkin* v. *Katz* to prevent termination of a private pension plan after the employee had served the company for a specified number of years in the reasonable belief that he would be entitled to a lifetime pension.

ment and less than one year before his retirement. Moreover, the Authority can point to sound reasons for retracting the plan. It was adopted in the midst of turbulence at the agency, and it does not require an overly suspicious frame of mind to infer that the proposal might have sought to evade the more parsimonious attitude expected of the new administration. Because of the plan's potential for significant impact on the Authority's future revenues (see note 3, *supra*), its recommittal for further study was prudent and a decision which could in the long run produce a sounder plan. Careful study and evaluation are especially appropriate where a plan will introduce "into the computations . . . adventitious payments to employees which could place untoward, massive, continuing burdens on the retirement systems." *Boston Assn. of Sch. Admrs. & Supervisors* v. *Boston Retirement Bd.*, 383 Mass. 336, 341 (1981). Whether the present situation is viewed as one involving a failure of vesting, or as one where if vesting had occurred, the interest could be permissibly retracted because it "had not been of such duration as to generate reasonable expectations that had to be respected" (*Massachusetts Teachers Assn.* v. *Teachers' Retirement Bd.*, 383 Mass. 345, 348 [1981]), we conclude that, on these facts, the plaintiff's interest is not sufficient to outweigh the Authority's interest in seeing that public funds are committed and expended in an orderly and deliberate manner.

The judgment is reversed; a new judgment is to be entered which dismisses the action.

*So ordered.*